**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | § | **Case No. 11-46399-705** |
| | § | |
| **LaToya L. Steward,** | § | **Chapter 7** |
| | § | |
| Debtor. | § | **[Docket Nos. 205, 236 & 250]** |

## ORDER DENYING THE MOTIONS FOR STAY

Each of the following persons, (i) Mr. James Robinson, a now-suspended bankruptcy attorney,[1] (ii) Critique Services L.L.C.,[2] the limited liability company that Mr. Robinson has repeatedly represented is his "d/b/a,"[3] and (iii) Mr. Elbert Walton, the now-suspended attorney who represented Mr. Robinson and Critique Services L.L.C. on the Motion to Disgorge [Docket No. 29] filed by the Debtor in this Case (each, a "Movant"; collectively, the "Movants"), filed a motion for stay [Docket Nos.[4] 205, 236 & 250] (each, a "Motion for Stay"; collectively, the

---

[1] Mr. Robinson has a large, high-volume/low-priced chapter 7 and chapter 13 debtor practice in this District. He "practices law" in association with his purported d/b/a, Critique Services L.L.C.

[2] The pleadings in this Case have inconsistently included a comma in the name "Critique Services L.L.C." between "Services" and "L.L.C."  When the Court refers to "Critique Services L.L.C.", it refers to "Critique Services L.L.C." or "Critique Services, L.L.C."—whichever is the proper legal name of that party. Neither Mr. Robinson nor Critique Services L.L.C. raised the issue of the comma in properly identifying the legal entity.

[3] This is not a legal conclusion that a natural person can be a d/b/a of an artificial legal entity.  At footnote 11 in the Order Denying the Motion to Set Aside [Docket No. 81], the Court expressed concern about whether, as a legal matter, an artificial entity can be a d/b/a of a natural person.  The Respondents never offered any comment or clarification on the point.  (In footnote 3 of the Memorandum Opinion, the Court cited its Order Denying the Amended Motion to Dismiss [Docket No. 82]—the document next on the docket sheet—as the document in which it made this observation about the d/b/a representation. Despite this incorrect docket citation, the substantive point remains true: the Court raised its concerns about the Movants' representation about Mr. Robinson and Critique Services L.L.C.'s relationship, and received no explanation.)

[4] All "Docket No." references refer to the docket entry in this Case, unless otherwise indicated to be a docket number in another case.  All "Case No." and

"Motions for Stay"), seeking a stay of the Memorandum Opinion (as defined herein) pending the appeal of that Memorandum Opinion, pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8005.[5] Because the Movants failed to satisfy the test for the granting of a stay under Rule 8005, the Court **ORDERS** that the Motions to Stay be **DENIED**.

## I. PROCEDURAL HISTORY

### A. The Memorandum Opinion and Its Appeal

On June 10, 2014, the Court entered a Judgment[6] [Docket No. 199] and a Memorandum Opinion and Order [Docket No. 200] (as amended,[7] together with the Judgment, the "Memorandum Opinion"), granting in part the Debtor's Motion to Disgorge [Docket No. 29] and ordering disgorgement, pursuant to § 329 of title 11 of the United States Code (the "Bankruptcy Code"[8]) of $495.00 in attorney's

---

"Adv. Proc. No." references refer to the indicated case or adversary proceeding pending before the U.S. Bankruptcy Court for the Eastern District of Missouri (the "Court"). All "District Court Case No." references refer to the indicated case pending before the U.S. District Court for the Eastern District of Missouri (the "District Court").

[5] Bankruptcy Rule 8005 provides that

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge . . . pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. . . . A motion for such relief . . . may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief . . . was not obtained from the bankruptcy judge. The district court or the bankruptcy appellate panel may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court.

[6] The Court may not be required to enter a separate judgment on the disposition of a motion. However, in an abundance of caution, the Court opted for the belt-and-suspenders route and entered a separate judgment.

[7] On June 11, 2014, the Court entered an Amended Memorandum Opinion [Docket No. 201], which corrected a typographical inadvertency on page 101 of the original Memorandum Opinion (amending "$30,0000.00" to "$30,000.00").

[8] Hereinafter, any reference to "§[§]" shall refer to the indicated section(s) of the Bankruptcy Code, unless otherwise indicated.

fees paid by the Debtor to Mr. Robinson and Critique Services L.L.C.  The Court also imposed nonmonetary sanctions under Federal Rule of Civil Procedure ("Rule") 37(b)(2) and § 105(a) for the failure to obey a discovery order and $49,720.00 in monetary sanctions (imposed jointly and severally upon the Movants). And, the Court imposed nonmonetary sanctions under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9011 and § 105(a) for abuse of judicial process, vexatious litigation, and the making of false statements. The nonmonetary sanctions included (i) a one-year suspension of Mr. Robinson and Mr. Walton, each, from the privilege of practicing before this Court in any capacity other than by self-representation, and (ii) a one-year suspension of Mr. Robinson and Mr. Walton, each, from the privilege of using the Court's remote-access filing mechanisms (the electronic filing system and exterior drop box[9]).  In addition, the Court referred the Memorandum Opinion to the Office of Disciplinary Counsel for the Missouri Supreme Court (the "OCDC") and to the District Court, for whatever actions, if any, those authorities might determine to be appropriate. The Court also reported the matter to the Office of United States Trustee (the "UST") for suspected bankruptcy fraud and abuse, and provided a copy of the Memorandum Opinion to the U.S. Attorney General, for that Office's information.

### B. The Notices of Appeal and Elections to Be Heard by the District Court

On June 12, 2014, Mr. Walton filed on behalf of himself a Notice of Appeal of the Memorandum Opinion [Docket No. 202].[10]  On June 24, 2014, Critique Services L.L.C., through its new counsel, Mr. Laurence Mass, filed a Notice of

---

[9] Mr. Robinson and Mr. Walton each remain free to file documents on his own behalf at the counter in the Office of the Clerk of Court (the "Clerk's Office"). However, neither can be trusted to use remote filing mechanisms in compliance with the Court's rules and policies.

[10] Mr. Walton attempted to file this document, and other documents presented for filing on June 12, 2014, on his own behalf as well as on behalf of Mr. Robinson and Critique Services L.L.C., in violation of his suspension from the practice of law and in violation of the prohibition on Mr. Robinson allowing any other person to act as his agent in filing a document on his behalf.  This point is discussed herein at Part II.B.1.

Appeal of the Memorandum Opinion [Docket No. 224]. Also on June 24, 2014, Mr. Robinson filed on behalf of himself a Notice of Appeal of the Memorandum Opinion [Docket No. 232]. Each Movant also filed a separate election to appeal to the District Court [Docket Nos. 203, 226, & 234]. On July 8, 2014, the District Court entered an order consolidating the appeals [Docket No. 257[11]].

At the same time that the Movants appealed the Memorandum Opinion, they also appealed certain interim orders. On July 8, 2014, the District Court entered an order [Docket No. 256] dismissing those appeals, concluding that all issues were brought in the appeal of the Memorandum Opinion.

### C. The Motions for Stay Filed Before this Court

On June 12, 2014, Mr. Walton filed on behalf of himself a Bankruptcy Rule 8005 motion requesting a stay of the Memorandum Opinion pending the appeal of the Memorandum Opinion (the "Walton Motion for Stay") [Docket No. 205]. On June 24, 2014, Mr. Robinson filed on behalf of himself a Bankruptcy Rule 8005 motion requesting a stay of the Memorandum Opinion pending the appeal of the Memorandum Opinion (the "Robinson Motion for Stay") [Docket No. 236]. Mr. Robinson contemporaneously filed a document captioned "reply memorandum" [Docket No. 237], which the Court deemed to be a brief in support of the Robinson Motion for Stay. Also on June 24, 2014, Critique Services L.L.C. filed, through Mr. Mass, a Bankruptcy Rule 8005 motion requesting a stay of the Memorandum Opinion pending the appeal of the Memorandum Opinion [Docket No. 229] (the "Original Critique Services L.L.C. Motion for Stay"). However, the Original Critique Services L.L.C. Motion for Stay contained a misleading representation about the UST. Accordingly, on June 30, 2014, Critique Services L.L.C. backpedaled and sought to amend.[12] Its amended motion (the "Critique

---

[11] A copy of certain orders of the District Court were docketed in this Case pursuant to the standard operating procedures of the Clerk's Office in appealed bankruptcy matters.

[12] This misleading representation and the amended language are discussed in greater detail herein at Part IV.B.19.

Services L.L.C. Motion for Stay") [Docket No. 250] corrected the misrepresentation.

### D. The Taking of the Motions to Stay as Submitted for Disposition

The Motions to Stay were not brought on an emergency basis. The Movants did not seek expedited consideration or request an expedited hearing. In fact, the Movants did not request a hearing at all. Yet, despite the non-emergency, non-expedited procedural posture in the Motions to Stay filed here, on June 25, 2014 (one day after the last two of the three Motions to Stay were filed with this Court), the Movants filed in the District Court a joint motion for stay the Memorandum Opinion pending its appeal (the "District Court Motion for Stay") [District Court Case No. 14-CV-1094 Docket No. 11].[13] Unlike the Motions for Stay filed here, the District Court Motion for Stay was brought on an emergency basis and requested expedited relief. In the District Court Motion for Stay, the Movants alleged that this Court had not ruled quickly enough on their non-emergency, non-expedited Motions to Stay pending here. Given this newly declared state of urgency by the Movants and their failure to request a hearing before this Court, the Court assumes that the Movants do not wish to reply to the Debtor's responses or to further brief this issue, or to be heard on oral arguments. The Court considers the Motions to Stay to be under submission.

### II. FACTS RELEVANT TO THE MOTIONS TO STAY

### A. Relevant Facts as Set Forth in the Memorandum Opinion

In the Memorandum Opinion, the Court detailed the year-long-plus history of the Movants' contempt, abuse of process, vexatious litigation, bad faith acts, dishonesty, and other sanctionable behavior. The Court recounted the numerous hearings held, notices given, and opportunities to respond afforded to the Movants prior to the imposition of the sanctions. The Court also made extensive findings of fact related to Mr. Robinson's and Critique Services L.L.C.'s failure to

---

[13] On July 8, 2014, the District Court entered an order [District Court Case No. 14-CV-1094 Docket No. 26], denying the District Court Motion for Stay on grounds of prematurity.

provide legal services to the Debtor. All findings of fact and conclusions of law in the Memorandum Opinion are incorporated in this Order.

### B. Relevant Facts After the Entry of the Memorandum Opinion

After the entry of the Memorandum Opinion, the Movants repeatedly made bad faith efforts to avoid their suspensions. These efforts are relevant to the determination of the merits of the Motions to Stay because they are evidence of whether a stay would harm the public interest (one of the factors considered when determining whether a stay should be granted).

### 1. Mr. Walton's and Mr. Robinson's June 12 bad faith violation of the Memorandum Opinion.

On June 12, 2014—the first day after the entry of the Memorandum Opinion—Mr. Walton presented to the Clerk's Office for filing four documents, including the Walton Motion for Stay.  Each document, by its signature block, caption, and internal references, purported to be a filing of Mr. Walton, as well as to be a filing of Mr. Robinson and, presumably, his purported d/b/a, Critique Services L.L.C. Because Mr. Walton's suspension unequivocally prohibited him from representing any other person before the Court and because Mr. Robinson's suspension unequivocally prohibited him from filing any document through an agent, the presentation by Mr. Walton of these documents for filing on behalf of Mr. Robinson and Critique Services L.L.C. was a bad faith violation of the terms of the suspensions.  The Clerk's Office accepted the documents, but immediately thereafter notified Chambers of the violation.  Chambers directed the Clerk's Office to enter the documents rather than to return them, but instructed the Clerk's Office to note in the caption at the entry of each document on the electronic docket: "Only Mr. Walton appeared at the counter to file document; Mr. Robinson did not appear at the counter to file the document. Document purports to be filed jointly by Mr. Walton and Mr. Robinson; Mr. Walton serving as Mr. Robinson's agent in any capacity before this Court is a violation of Memorandum Order of 6-11-14."  [Docket Nos. 202, 203, 204, & 205]. In addition, on June 13, 2014, the Court entered an Order [Docket No. 207], finding that Mr. Walton and Mr. Robinson each had violated the terms of his suspension.  The Court gave

6

notice that if either Mr. Walton or Mr. Robinson attempted to violate the terms of the Memorandum Opinion again, additional sanctions might be imposed and the violating documents might be returned without filing.

**2.    Mr. Walton's and Mr. Robinson's June 17 bad faith attempt to amend by filing a document purporting to be a "reply."**

On June 16, 2014, the Debtor filed a Response to the Walton Motion for Stay (the "Response to the Walton Motion") [Docket 212] and a brief in support [Docket No. 213].  On June 17, 2014, Mr. Walton and Mr. Robinson (together at the Clerk's Office) presented for filing a document captioned "Respondents' [sic] Walton and Mr. Robinson's Reply Memorandum in Support of their Motion for Stay of Judgment and Order" [Docket No. 214].

Setting aside the fact that Mr. Robinson had not even filed a Motion for Stay at that point (given that Mr. Walton's attempt to act as Mr. Robinson's agent in filing the Walton Motion for Stay was legally ineffective), the "reply memorandum" document was not a reply at all.  It made new legal arguments and raised new factual allegations in support of the Walton Motion for Stay. It appeared to be an attempt to amend the Walton Motion for Stay.  Ordinarily, a party can amend a motion once without leave.  However, a party may not, in bad faith, attempt to "amend" by filing a misleadingly captioned document, in an effort to cut off the opportunity to respond to the pleading as a matter of right (leave must be granted to file a sur-reply).  Mr. Walton filed this "reply" in bad faith and without leave of Court or by any other authority. Accordingly, on June 18, 2014, the Court entered an Order Striking the Docket No. 214 [Docket No. 215], noting:

> [t]his is yet-another instance of Mr. Walton and Mr. Robinson litigating in bad faith in this matter. (This is not the first time that Mr. Robinson and Mr. Walton have attempted to sandbag the Debtor and manipulate the judicial process through untimeliness and improper pleadings, as detailed throughout the Memorandum Opinion.)  The "reply" appears to be an effort to "get in the last word," in a strategy designed to deprive the Debtor of the opportunity to be heard as a matter of right.

**3.    Mr. Walton's and Mr. Robinson's bad faith by seeking to affect the Memorandum Opinion without providing notice to the Debtor.**

On June 19, 2014, Mr. Walton filed a response in *In re Jatuane Mobley* (Case No. 14-44207) (the "*Mobley* Response") [Case No. 14-44207 Docket No. 17]. Although *In re Mobley* was an unrelated bankruptcy case before another Judge of this Court, Mr. Walton captioned the *Mobley* Response as a "counter-motion" and requested that the *Mobley* Judge either stay the Memorandum Opinion entered in this Case, or transfer the request for a stay filed in this Case to an *en banc* panel of the U.S. Bankruptcy Court.[14]  The Chambers of the undersigned Judge was advised by the Clerk's Office of the *Mobley* Response when it was filed.[15]

In the Certificate of Service attached to the *Mobley* Response, Mr. Walton represented that he served the *Mobley* Response upon those parties who received CM-ECF service in that case. Since the Debtor was not a party in *In re Mobley*, Mr. Walton thereby certified that he did not serve the *Mobley* Response upon the Debtor. That is, Mr. Walton tried to backdoor a request for relief related to the Memorandum Opinion entered in this Case, before another Judge, in an unrelated matter, without providing service of that effort upon the Debtor. Later on June 19, 2014, the undersigned Judge entered an order in *In re Steward* [Docket No. 219], noting Mr. Walton's bad faith in failing to give the Debtor notice of his effort in *In re Mobley*. At 10:29 A.M. on June 23, 2014, Mr. Walton presented to the Clerk's Office for filing a notice of hearing [Case No. 14-44207 Docket No. 20], in which he represented that he had served his *Mobley* Response to the Debtor's counsel "on this June 19, 2014." However, Mr. Walton's notice of hearing was not filed "on this June 19, 2014," but was filed days later, after the order in this Case noting Mr. Walton's failure to serve the Debtor of the *Mobley* Response.

---

[14] The *Mobley* Response was filed in "response" to the chapter 13 trustee's motion for guidance as to what he should do during the suspensions with the attorney's fees payable to Mr. Walton and Mr. Robinson.

[15] By this time, Mr. Walton and Mr. Robinson had attempted to violate the terms of their suspensions so often that the Clerk's Office notified Chambers of any filing made by either attorney.

Mr. Robinson also joined in the bad faith effort to undermine the Memorandum Opinion in *In re Mobley*, by making a false statement. At 8:47 A.M. on June 23, 2014, Mr. Robinson presented to the Clerk's Office for filing his response in *In re Mobley* [Case No. 14-44207 Docket No. 18], in which he falsely stated that the Memorandum Opinion "purports to impose criminal contempt powers . . ." However, on pages 64-67 of the Memorandum Opinion, the Court discusses the difference between civil and criminal sanctions, and specifically states that the sanctions are civil, not criminal. The Court therefore was purporting to impose civil sanctions. Accordingly, by the unequivocal terms of the Memorandum Opinion, the Court purported to do the exact opposite of what Mr. Robinson represented that the Court purported. Moreover, Mr. Robinson made this collateral attack on the Memorandum Opinion without providing service to the Debtor's counsel (as shown in his Certificate of Service).

To any degree, the *Mobley* Judge rejected the requests for relief related to the Memorandum Opinion.

**4.      Mr. Robinson's June 20 violation of his suspension.**

On June 13, 2014, the Court had given notice that any future documents presented for filing that violated the Memorandum Opinion would be returned. On June 20, 2014, Mr. Robinson violated the terms of his suspension by presenting to the Clerk's Office for filing documents that were representations of Mr. Robinson, Mr. Walton and Critique Services L.L.C. Accordingly, on June 20, 2014, the Court entered an order [Docket No. 221], directing that the pleadings presented for filing be returned to Mr. Robinson, without prejudice to him filing the documents on behalf of himself only.

**5.    Mr. Mass's June 20 presentation for filing on behalf of Critique Services L.L.C. documents that were prepared by Mr. Robinson and Mr. Walton.**

On June 20, 2014, Mr. Mass presented to the Clerk's Office for filing on behalf of Critique Services L.L.C. six documents. [16] Upon review of the documents, the Court entered an order [Docket No. 222] determining that:

> Mr. Mass's documents presented for filing are copies of documents previously filed with, or previously presented for filing by, either Mr. Robinson or Mr. Walton—with only the signature block blanked out and with Mr. Mass's signature handwritten inserted where the previous signature block had been. In one of the documents, Mr. Mass did not even bother to cover up Mr. Robinson's signature block—he simply crossed it out before adding his own, handwritten signature block. Moreover, the documents presented by Mr. Mass refer to being brought by the "Appellants" or "James C. Robinson, Critique Services L.L.C. and Elbert A. Walton"—even though Mr. Mass attests in his handwritten signature block that he represents only Critique Services L.L.C.
>
> These documents are a mess. There is no coherent representation as to who Mr. Mass represents or on whose behalf the documents are to be filed. They amount to a poorly executed cut-and-paste job that involved no lawyering effort whatsoever. And, there is not even the pretense that this is Mr. Mass's work. It is clearly the work of the suspended Mr. Walton and the suspended Mr. Robinson. *However, neither [Mr.] Walton nor Mr. Robinson is permitted to practice before this Court in any capacity other than on behalf of himself.* That includes being prohibited from "ghost-writing" documents or providing documents for another attorney to file with the Court on behalf of Critique Services L.L.C.
>
> Mr. Mass is in good standing with this Court and is welcome to represent Critique Services L.L.C. before this Court. However, his representation of Critique Services L.L.C. may not be used to facilitate Mr. Walton's and Mr. Robinson's violation of their suspensions. If Mr. Walton, Mr. Robinson, and Mr. Mass had any designs on Mr. Mass being improperly used as a pass-through vehicle, through which Mr. Walton and Mr. Robinson could practice

---

[16] By presenting these documents for filing at the counter in the Clerk's Office, Mr. Mass violated L.B.R. 5005-A, which requires that an attorney who has a CM-ECF log-in to file documents electronically.  On June 23, 2014, the Court entered an order [Docket No. 223], directing that Mr. Mass file documents electronically.

before this Court on behalf of Critique Services L.L.C. under Mr.
Mass's name, those plans end now. Any document Mr. Mass may
file on behalf of Critique Services L.L.C. before this Court may not
be the cribbed or ghost-written work of Mr. Robinson or Mr. Walton.

The Court ordered that the documents be returned, "without prejudice to Mr.
Mass filing requests for relief that are not the work of Mr. Robinson or Mr.
Walton, and in which Mr. Mass makes clear and coherent representations as to
whom he represents." The Court also gave notice that future efforts by Mr. Mass
to file documents on behalf of Critique Services L.L.C. that are the lawyering
product of Mr. Robinson or Mr. Walton may result in sanctions being imposed
upon Mr. Mass.

**6.    Mr. Robinson's attempts to violate his suspension through the
representations of Mr. Ross Briggs.**

Shortly after the entry of the Memorandum Opinion, an attorney, Mr. Ross
Briggs,[17] began filing documents on behalf of debtors who were clients of Mr.
Robinson. These documents were, at best, misleading, and were filed in a
blatant effort to assist Mr. Robinson in avoiding the effect of his suspension.

**a.  Mr. Briggs's misleading Notices of Appearance.**

Mr. Briggs filed Notices of Appearance in cases of Mr. Robinson's clients
that were pending at the time of Mr. Robinson's suspension. In those Notices of
Appearance, Mr. Briggs represented that he would serve as counsel *with* Mr.
Robinson, rather than *instead of* Mr. Robinson. This representation was
ineffective: an attorney in good standing cannot serve as co-counsel with an
attorney who is prohibited from practicing before the Court. Such a
representation is akin to an attorney representing that he will serve as co-counsel
with a plumber, or an astronaut, or a neurosurgeon—that is, with someone who
cannot practice law on behalf of another person before this Court. Accordingly,

---

[17] Mr. Briggs's name appears at other points in this Order. He has a long
professional association with Critique Services L.L.C. He was a co-defendant
with Critique Services L.L.C. in a 2003 adversary proceeding, and currently is a
co-defendant (along with Mr. Robinson and other persons allegedly affiliated with
Critique Services L.L.C.) in the Adversary Proceeding No. 13-4284, an action
filed by the Debtor.

the Court denied each of such Notice of Appearance.  In doing so, however, the Court did not prohibit Mr. Briggs from representing Mr. Robinson's clients upon the filing of a new notice of appearance—one without the misleading "co-counsel" representation.  Since this Court's denial of the misleading Notices of Appearance, the other Judges of this Court also have rejected Mr. Briggs's contention that he can serve as "co-counsel" with Mr. Robinson during Mr. Robinson's suspension.

Ironically, on June 24, 2014, Mr. Briggs filed a Notice of Appeal [Case No. 14-41617 Docket No. 19] of the Order Denying his Notice of Appearance [Case No. 14-41617 Docket No. 27] in *In re Debra Wilson* (Case No. 14-41617).  Mr. Briggs chose to spend $298.00 to do this, instead of simply filing (at no cost) a new notice of appearance without the "co-counsel" misrepresentation.  However, contemporaneously with filing the Notice of Appeal, Mr. Briggs also filed a motion for stay the order denying his notice of appearance pending appeal [Case No. 14-41617 Docket No. 27].  In that motion for stay, Mr. Briggs represented that he serves as counsel to the *Wilson* debtor, without any misleading "co-counsel" representation. Accordingly, upon that representation, the Court entered an order [Case No. 14-41617 Docket No. 30] directing that Mr. Briggs be deemed to be the sole counsel for the debtor, removing Mr. Robinson as counsel of record, and denying the motion for stay. The Court also noted that Mr. Briggs was free to re-file the motion to reopen the case.  (The motion to reopen Mr. Briggs had filed previously was denied because it was filed contemporaneously with the misleading Notice of Appearance.  On July 21, 2014, Mr. Briggs filed a new motion to reopen [Docket No. 39], which was granted [Docket No. 43] on July 23, 2014.  The *Wilson* appeal is pending as District Court Case No. 14-CV-1144.[18]

---

[18] On July 8, 2014, in the appeal of the Memorandum Opinion, *Robinson, et al. v. Steward*, District Court Case No. 14-CV-1094, the District Court entered an order [District Court Case No. 14-CV-1094 Docket No. 27] denying a request to consolidate the *Wilson* appeal with the appeal of the Memorandum Opinion, and dismissing Ms. Wilson as an appellant.  In that order, the District Court also noted that, since the Bankruptcy Court now has made Mr. Briggs the attorney of record in *In re Wilson*, the *Wilson* appeal appears to be moot.

### b.  Mr. Briggs's misleading Bankruptcy Rule 2016 Statements.

Mr. Briggs filed Bankruptcy Rule 2016 Statements [19] in certain new bankruptcy cases that Mr. Briggs filed for Mr. Robinson's clients after Mr. Robinson's suspension.  In the Bankruptcy Rule 2016 Statements, Mr. Briggs stated that he would represent the debtor on a "joint representation" basis with Mr. Robinson. However, Mr. Briggs cannot "jointly represent" a party along with Mr. Robinson.  Mr. Robinson cannot "jointly represent" another person before this Court any more than he can "solely represent" another person before this Court. Mr. Robinson is prohibited from practicing before this Court in the representation of another person in any capacity—jointly or otherwise.  In addition, in the Bankruptcy Rule 2016 Statements, Mr. Briggs made inconsistent representations regarding whether he had a fee-sharing agreement with Mr. Robinson.[20]  And, if Mr. Briggs had a fee-sharing agreement, such an agreement would contradict his representation that he was donating his services.

The Court addressed the numerous problems with the Bankruptcy Rule 2016 Statements in a multi-case order entered on June 25, 2014 in *In re Tamika Ecole Henry, et al.* (Case Nos. 14-44922, 14-44980, 14-44985, 14-44986, 14-44987, 14-44992, 14-44993, 14-44994, 14-45020, 14-45026, 14-44818, 14-44820, 14-44822, & 14-44855).  In that order, the Court directed that Mr. Briggs

---

[19] Section 329 provides that any attorney representing a debtor shall file a statement of the compensation paid or agreed to be paid for "services rendered or to be rendered in contemplation of or in connection with the case."  Bankruptcy Rule 2016(b), in turn, provides that: "[e]very attorney for a debtor . . . shall file . . . the statement required by § 329 . . . including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required."

[20] Rule 4-1.5(e) of the Missouri Supreme Court's Rules of Professional Conduct provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation; (2) the client agrees to the association and the agreement is confirmed in writing; and (3) the total fee is reasonable."  Mr. Briggs's Bankruptcy Rule 2016 Statements did not appear to establish any of these requirements.

file, in each subject case, a corrected Bankruptcy Rule 2016 Statement and an affidavit attesting to the fact that he advised the debtor that Mr. Robinson has been suspended from the practice before this Court for one year and will not be the attorney of record, and that Mr. Briggs will be the sole attorney of record and will provide his services for free and may not fee-share with Mr. Robinson. A copy of that multi-case Order was entered in this Case, to memorialize Mr. Robinson's efforts to avoid his suspension [Docket No. 241].

### c. Mr. Briggs's and Mr. Robinson's misleading attorney retention agreements that were executed after Mr. Robinson's suspension.

In the face of Mr. Briggs's filings regarding his purported "co-counsel" status and "joint representation" with Mr. Robinson, one of the other Judges of this Court required that Mr. Briggs file a copy of the attorney retention agreements executed by Mr. Briggs, Mr. Robinson and Mr. Robinson's clients following Mr. Robinson's suspension. An example of one such attorney retention agreement, filed in *In re Asa Mulania Pierce* (Case No. 14-44982) [Docket No. 17], is attached as Attachment A. Therein, Mr. Robinson and Mr. Briggs both represent that they serve as the debtor's counsel.[21] Thus, *both* Mr. Robinson and Mr. Briggs had an obligation of candor with the client. It was not merely Mr. Robinson's obligation to tell the client the truth about the reason for Mr. Briggs's involvement. Whatever professional relationship Mr. Briggs might have with Mr. Robinson, it does not trump Mr. Briggs's obligation of candidness owed to his client, to allow the client to make an informed decision about attorney retention.

Despite this obligation of candidness, the attorney retention agreement appears to be evasive and disingenuous in its references to Mr. Robinson's professional circumstances. It provides that Mr. Robinson will serve as "co-counsel" for the debtor, and that Mr. Robinson and Mr. Briggs will "assume joint responsibility for the representation of the client." However, Mr. Robinson cannot serve as co-counsel or "assume joint responsibility" in any matter before the Court because he is suspended. In addition, the attorney retention agreement

---

[21] Mr. Dean Meriwether, a non-suspended attorney who is affiliated with Critique Services L.L.C., also was a signatory to the attorney retention agreement.

provides that "Client understands that court appearances, responses to motions and pleadings on their [sic] behalf will be made by co-counsel during the pendency of restrictions upon James C. Robinson." This makes it appear that Mr. Briggs (or, perhaps, Mr. Meriwether) would serve merely as Mr. Robinson's stand-in for filing documents and face-time with the Court—but that, in all other respects, Mr. Robinson would continue to practice law on behalf of the Debtor.

Moreover, the use of the term "restrictions" in the attorney retention agreement is deliberately imprecise, if not out-right inaccurate. Referring to Mr. Robinson's circumstances as being subject to "restrictions" suggests that his privilege of practice remains intact, but merely is subject to limitations. However, it is not any more accurate to describe Mr. Robinson as "restricted" from practicing before this Court than it is to describe someone as "restricted" from life by being dead. There are no mere "restrictions" on his privilege to practice for the next year; his privilege is suspended, in its entirety, for the next year.[22]

---

[22] The attorney retention agreement contained other problematic terms. For example, Mr. Robinson and Mr. Briggs represent that, carved out from their services, will be any appearance at a continued § 341 meeting (even though the debtor is required to attend a § 341 meeting) and preparation of any amendments to the petition (even though the debtor is required to properly amend his petition). The attorney retention agreement also tries to shift the burden of the liability for the lawyering from the attorney to the client, providing that "Client agrees to review the petition and all documents for accuracy prior to the filing of the petition and assume all responsibility for error or omissions after this point"—as if, somehow, the client's review of legal documents relieves the attorney from his responsibility for his own errors and omissions in the documents that he prepared. And, the retention agreement tries to hide the fact that a debtor can recover his fees under certain circumstances: "Client understands there will be no refunds issued after the signing of this agreement . . ." Contrary to this assertion, under both the Rules of Professional Conduct and § 329(b), a client is entitled to a refund of his fees when legal services are not rendered or the fees paid exceed the value of the services. Then, the last sentence of the attorney retention agreement provides that the information "listed on the attorney request form must be received within 90 days of the initial consultation or your processing fees will be forfeited." The document does not define "processing fee." However, if the "processing fee" is the $299.00 fee charged under the terms of the attorney retention agreement for the filing of the bankruptcy case, the attorneys may not keep any unearned portion of the fees if the attorney does not provide legal services. The attorneys do not "earn"

The client was entitled to a candid and complete explanation about the fact that Mr. Robinson can no longer practice law before this Court, so that she could make a fully informed decision about whether she wanted to enter into an agreement that purported to be for the "co-counsel" services of a suspended attorney. She was entitled to know that Mr. Robinson must return any unearned portions of his legal fees that she paid to him—and that he could not keep her unearned fees by simply passing them along to Mr. Briggs, without the client's knowing and fully informed consent. She was entitled to determine, on a knowing and fully informed basis, whether she wanted to be represented by Mr. Briggs, knowing that Mr. Robinson could not participate in that representation as co-counsel. But instead of providing the information necessary to allow the client to make a knowing and informed decision, the attorney retention agreement buried and hid the fact of Mr. Robinson's suspension.

## III.  JURISDICTION

The Movants presented their Motions to Stay to the undersigned bankruptcy judge, as required by Bankruptcy Rule 8005.  As such, the Court has subject matter jurisdiction over the issue of whether it is proper to stay the Memorandum Opinion pending appeal.  The fact that the Movants contemporaneously filed the District Court Motion for Stay did not deprive this Court subject matter jurisdiction over the Motions to Stay pending here.  In addition, Mr. Walton filed on May 7, 2013, a notice of appearance on behalf of Mr. Robinson and Critique Services L.L.C., and has actively represented their interests and his own in this Case. Accordingly, the three Movants have admitted personal jurisdiction.

## IV.  LEGAL STANDARD FOR DETERMINING THE MOTIONS TO STAY

When considering a discretionary[23] motion for stay a final order, the Court applies a four-factor test: (1) whether the movant is likely to succeed on the

---

their legal services fees by doing nothing other than waiting for the client to fail to provide the requisite information.

[23] If the movant on a motion for stay pending appeal files a supersedeas bond that is approved by the Court, he is entitled to a stay of any money judgment.  A motion for stay without the filing of a supersedeas bond or a motion for stay as to

merits of the appeal; (2) whether the movant will suffer irreparable injury if the stay is not granted; (3) whether other interested parties would suffer substantial harm if the stay is granted; and (4) whether the issuance of the stay will serve, or not harm, the public interest. *Straights and Gays for Equality (SAGE), N.R. v. Osseo Area School Dist. No. 279*, 2006 WL 890754, at *1 (D. Minn. Apr. 6, 2006); *In re Havens Steel Co.,* 2005 WL 562733, at *6 (W.D. Mo. Jan. 12, 2005); *In the Matter of Mansion House Ctr. S. Redev. Co.,* 5 B.R. 826, 832 (E.D. Mo. 1980). These factors are conjunctive.   However, "[i]n considering the four factors . . . each factor need not be given an equal weight, but rather a balancing of the elements is required." *In re Cash*, 1996 WL 33403450, at *1 (Bankr. C.D. Ill. Jan. 10, 1996)(citing *In re Great Barrington Fair and Amusement, In*c., 53 B.R. 237 (Bankr. D. Mass. 1985), and *In re Hotel Assocs., Inc.,* 7 B.R. 130 (Bankr. E.D. Pa. 1980)); *see In re DiClemente*, 2012 WL 5211942, at *2 (D.N.J. Oct. 22, 2012)(holding that "[t]hese stay factors require individualized judgments based on the circumstances of each particular case and, accordingly, should not be rigidly applied.").

## V. FACTOR 1:

### Whether the Movants would be likely to succeed
### on the merits of the appeal

Factor 1 "goes to the sensible administration of justice: a stay should not ordinarily be granted if the court determines that the injunction will ultimately take effect in any event."  *The First Nat'l Bank in Sioux Falls v. First Nat'l Bank of South Dakota*, 2011 WL 835815, at *2 (D.S.D. Mar. 4, 2011)(quoting *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1077 (8th Cir. 1974)).  Factor 1 is the most significant of the four factors.  *S & M Constructors, Inc. v. The Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). For the following reasons, the Court **FINDS** that the Movants are not likely to succeed on the merits of the appeal and **HOLDS** that Factor 1 does not weigh in favor of granting a stay pending appeal.

---

nonmonetary sanctions is discretionary.  The Movants did not file a supersedeas bond or seek approval of the Court for such a bond.

## A. Likelihood of Success on the Merits of the Appeal
## on the Issue of Recusal

Mr. Robinson argues that it is likely that he will succeed on the merits of the appeal based on argument that recusal was required under 28 U.S.C. § 455 and § 144. Before the Court provides analysis of this issue, it will provide a review of the recusal requests made in this Case:[24]

**The First Motion to Recuse.** Mr. Robinson and Critique Services L.L.C. did not seek recusal until, shortly after the Court entered its September 20, 2013 Order Compelling Discovery [Docket No. 68]. Then, Mr. Robinson and Critique Services L.L.C. suddenly filed—along with numerous other pleadings lobbed in an effort to avoid making discovery—their First Motion to Recuse [Docket No. 69]. In it, Mr. Robinson and Critique Services L.L.C. sought recusal based on the Judge's previous service in governmental employment as the UST, and on the allegation that Court actions in this Case establish bias under § 455(b)(1),[25] or make it reasonable to question the Judge's impartiality under § 455(a).[26] They did not request an evidentiary hearing, but instead rested on the allegations made in their papers. On September 25, 2014, the Court entered an order [Docket No. 71] denying the First Motion to Recuse for untimeliness or, alternatively, denying it on the merits.

**Between the First and Second Motions to Recuse.** In the seven months after the denial of the First Motion to Recuse, Mr. Robinson and Critique Services L.L.C.: twice sought leave to appeal interim orders related to discovery

---

[24] This recounting of the facts is only a summary. The Court provided detailed findings and conclusions of law in its discussion of judicial disqualification at pages 41-60 of the Memorandum Opinion.

[25] Section 455(b)(1) provides that a judge (including a bankruptcy judge) shall disqualify himself "[w]here he has personal bias or prejudice concerning a party . . ." Herein, all references to "recuse" or "recusal" shall mean "disqualify" or "disqualification" for purposes of § 455, and all references to "bias" shall mean "bias or prejudice."

[26] Section 455(a) provides that a judge (including a bankruptcy judge) shall disqualify himself "in any proceeding in which his impartiality might reasonably be questioned."

and sanctions (one motion for leave to appeal was denied by the Bankruptcy Appellate Panel, and the other motion for leave to appeal was not adjudicated by the District Court before the entry of the Memorandum Opinion, then was dismissed by the District Court upon the filing of the appeal of the Memorandum Opinion); filed a petition for writ of mandamus in the District Court (the petition was dismissed); and incurred $35,000.00 in sanctions for refusing to comply with the Order Compelling Discovery.  In addition, they incurred escalating sanctions, including a contempt finding, and Mr. Robinson's initial suspension from the use of the Court's remote access filing systems (which Mr. Robinson violated in February 2014 and for which he incurred another $3,000.00 in sanctions).

Beginning in January 2014, the Debtor, Mr. Robinson, and Critique Services L.L.C., along with the other defendants in Adversary Proceeding No. 13-4284, [27] undertook settlement negotiations. Mr. Robinson and Critique Services L.L.C. did not seek a stay of the effectiveness of the Order Compelling Discovery during the undertaking of the settlement efforts, although they continued to refuse to make discovery.  As such, they persisted in their contempt throughout this period.

On March 22, 2014, the Debtor filed a declaration [Docket No. 133], advising the Court that she believed that settlement negotiations had reached an impasse.  Upon being so advised, the Court began to prepare to enter a final disposition on the Motion to Disgorge. This preparation included giving due process notice to those persons that the Court was considering sanctioning on a final basis in connection with their behavior related to the Motion to Disgorge.  On April 3, 2014, the Court entered Notices, advising Mr. Robinson and Critique Services L.L.C. [Docket No. 134] and Mr. Walton [Docket No. 136] that the Court intended to impose sanctions and providing an opportunity for them to respond.

---

[27] On December 9, 2013, the Debtor, through her counsel, filed a complaint commencing Adversary Proceeding No. 13-4284.  This adversary proceeding named as defendants Critique Services L.L.C. and Mr. Robinson, as well as other persons allegedly affiliated with Critique Services L.L.C., including Mr. Briggs, Beverly Holmes Diltz, Renee Mayweather, and Doreatha Jefferson.

**The Second Motion to Recuse**.  On April 11, 2014, Mr. Robinson filed a Response to the April 3 Notice [Docket No. 149].  Mr. Walton filed the Second Motion to Recuse [Docket No. 153] on behalf of himself only.  In it, Mr. Walton alleged, among other things, that the Judge was biased against him based on the fact that the Court—months earlier—had offered to his clients an alternate, nonmonetary method by which they could satisfy their sanctions.  Basically, Mr. Walton complained about the fact, in that offer, that the Court recognized Mr. Walton's role in his clients' contempt by including the term that his clients agree to never hire Mr. Walton again in any matter before this Court. This was not evidence of bias against Mr. Walton or of the reasonableness of questioning the Judge's impartiality. It was evidence that the Court held an opinion of Mr. Walton that was warranted by the facts of the Case—that he had spearheaded and promoted his clients' sanctionable behavior.  If Mr. Walton did not want the Court to have a low professional opinion of him, then he should not have acted in a way that warranted such an opinion.  But an attorney cannot avoid the imposition of sanctions against him by complaining that the judge who observed his sanctionable behavior has a resulting low professional opinion of him.  On April 14, 2014, the Court entered an order denying the Second Motion to Recuse [Docket No. 163].

**Between the Second and Third Motions to Recuse.**  On April 14, 2014, Mr. Walton sued the Judge in his personal capacity in state court for acts taken by the Court in this Case (the "State Court Action"). The Judge was served with the petition in the State Court Action on April 16, 2014.  On May 2, 2014, the State Court Action was removed to the District Court on the defense of judicial immunity.  On July 10, 2014, the District Court entered an order denying Mr. Walton's Amended Motion to Remand [Case No. 14-CV-0864 Docket No. 13].

On April 21, 2014, the Court entered another Notice [Docket No. 165] of its intent to impose sanctions, giving notice to Mr. Robinson, Critique Services L.L.C. and Mr. Walton that the Court intended to impose sanctions upon them for the making of false statements, including false statements made in connection with the request for the Judge's recusal.  The Court had previously issued orders

finding that Mr. Robinson and Critique Services L.L.C., through Mr. Walton, had made false statements. Mr. Robinson, Critique Services L.L.C. and Mr. Walton filed responses to the April 21 Notice [Docket Nos. 178 & 179].

**The Third Motion to Recuse.**  On April 22, 2014, the Movants filed the Third Motion to Recuse [Docket No. 168], this time seeking the Judge's recusal[28] principally under 28 U.S.C. § 144. However, by its plain language, § 144 does not apply to bankruptcy judges.  The Movants did not offer support for their contention that it applies to bankruptcy judges. In addition, in the Third Motion to Recuse, the Movants made unreasonable inferences, self-serving innuendo, and numerous false statements—many of which had been addressed previously.

The Movants also argued that recusal was required because Mr. Walton chose to sue the Judge.  However, while suing a judge may result in the judge developing a lack of respect for the party suing him, that lack of respect is not bias.  Bias is an *improper* predisposition—that is, an opinion not warranted by the facts.  A judge is permitted to have an opinion about a party that is warranted by the facts as he observes them in the course of a matter before him, including observations related to litigation tactics.  Similarly, suing a judge also is not evidence that it is reasonable to question the judge's impartiality.  Federal judges have judicial immunity from suit for their official acts. While such a suit might be annoying, annoyance is not bias, and a judge being annoyed does not make it reasonable to question his impartiality—even if the ideal judicial temperament might be one of Siddhartha-like serenity. If a judge were required to recuse every time he became annoyed with a party or a party's tactics, the justice system likely would become permanently incapacitated. Boiled down, the Movants argued that they were entitled to judge-shop because of Mr. Walton's decision to sue the judge—a theory that would make it open lawsuit season on judges, as an attorney could buy a judge assignment for the relatively nominal cost of a state

---

[28] Like § 455, § 144 does not use the term "recuse."  It also does not use § 455's term "disqualify."  Instead, it provides that a judge shall "proceed no further" in a case.  The Court interprets this to be a form of recusal.

21

court petition.  On April 23, 2014, the Court entered an Order Denying the Third Motion to Recuse [Docket No. 170].

**1. Likelihood of success on the merits of the appeal based on the argument that recusal was required because of the Judge's previous service in governmental employment as the UST.**

Mr. Robinson argues that he is likely to succeed on the merits of the appeal based on his argument that recusal was required under § 455(b)(1) for actual bias or because of the reasonableness of questioning the Judge's impartiality under § 455(a) based on the Judge's previous service as the UST. The law and record do not support this argument.

**a. Facts related to the Judge's service as the UST.**

The facts related to the Judge's service in governmental employment as the UST are as follows: Approximately a decade ago, beginning in June 2003, the Judge served in governmental employment as the UST for Region 13, which includes this District.  The Judge resigned as the UST upon his elevation to the bench on May 23, 2006. During his service as the UST, his Office received complaints about Critique Services L.L.C. from the public, undertook investigations into Critique Services L.L.C., and was involved in two adversary proceedings against Critique Services L.L.C. and several people affiliated with Critique Services L.L.C.  In his statutory role as the UST, the Judge was the name-plaintiff in the adversary proceedings and was the supervisor of the assistant USTs.  The Judge was involved in the Critique Services L.L.C.-related matters only in his official capacity, not in his personal capacity. In addition, in the execution of his official duties, he did not chair litigation, enter an appearance as a prosecutor, serve as an investigator, or personally draft documents.  Neither of the adversary proceedings involved Mr. Robinson or Mr. Walton.

One of the two Critique Services L.L.C. adversary proceedings pending while the Judge served as the UST was *Rendlen v. Ross Briggs, et al. (In re Thompson)* (Adv. Proc. No. 03-4003).  *Rendlen v. Briggs* was commenced by the Judge's UST predecessor, Joel Pelofsky (the Judge was substituted as the name-plaintiff in his official capacity upon his appointment as the UST). The

22

matter was resolved in two parts. First, on April 30, 2003, the matter was settled between defendant Ross Briggs and Mr. Pelofsky, as UST (the Judge had not yet been appointed as the UST) by the entry of an agreed order [Adv. Proc. No. 03-4003 Docket No. 10] (a copy of which is attached as <u>Attachment B</u>), pursuant to which Mr. Briggs agreed to pay $10,000.00 to certain clients, attend ethics or bankruptcy education, and not file any new bankruptcy cases in this District for six months. Later, on December 29, 2003, the matter was resolved between defendants Beverly Diltz and Critique Services L.L.C. and the UST (by then, the undersigned presiding Judge) by the entry of a permanent injunction and consent order [Adv. Proc. No. 03-4003 Docket No. 63] (a copy of which is attached as <u>Attachment C</u>), pursuant to which Ms. Diltz and Critique Services L.L.C. agreed to terms that included their being prohibited from providing bankruptcy petition preparation services to the public.

The other of the two Critique Services L.L.C. adversary proceedings pending while the Judge served as the UST was *Gargula v. Beverly Diltz, et al. (In re Harge)* (Adv. Proc. No. 05-4254). *Gargula v. Diltz* was commenced in the year before the Judge's resignation as the UST, but discovery and the settlement negotiations occurred after the Judge's resignation. On July 31, 2007, the matter was resolved between the defendants, represented by Mr. Laurence Mass, and Nancy Gargula, as UST (the Judge's UST successor), by the entry of a settlement agreement and order [Adv. Proc. No. 05-4254 Docket No. 84] (the "*Diltz* Order," a copy of which is attached as <u>Attachment D</u>). Pursuant to the *Diltz* Order, the defendants agreed to, among other things, cease bankruptcy preparation services.

### b. Analysis of recusal based on the Judge's service as the UST.

The circumstances of previous service in governmental employment that require judicial recusal are specific and limited—much more limited than for a judge coming from private practice employment.[29] Section 455(b)(3) provides those circumstances: a judge shall disqualify himself "[w]hen he has served in governmental employment and in such capacity participated as counsel, adviser

---

[29] *See* 28 U.S.C. § 455(b)(2).

or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."  Here, the Debtor's Case was not filed until long after the Judge resigned as the UST.  As such, neither the "proceeding" or "particular case in controversy" elements could have been satisfied by the terms of the statute.  The inapplicability of § 455(b)(3) was indisputable.  The Movants did not seek recusal under § 455(b)(3).

Instead, the Movants argued that the Judge's service as the UST left him biased against Critique Services L.L.C. and its employees or otherwise affiliated persons, or made it reasonable to question his impartiality in matters involving Critique Services L.L.C. and its employees or affiliated persons, and sought his recusal under § 455(b)(1) for actual bias and § 455(a) for the reasonableness of questioning the Judge's impartiality.  However, they did not seek recusal on this ground timely, as required by law.  It was not until September 24, 2014—more than two years after the Case was filed and Judge Rendlen was assigned and six months after the Motion to Disgorge was filed—that they filed the First Motion to Recuse, shortly after the entry of the Order Compelling Discovery.

The Movants did not request an evidentiary hearing on the issue raised in the First Motion to Recuse, and they pleaded no true allegations that established their request for recusal.  Rather, they just pointed to the fact of the Judge's service as the UST, then piled on innuendo and baseless conclusions. They also made numerous false allegations about the Judge's service as the UST, in an effort to give the false impression about the Judge's involvement in the Critique Services L.L.C. matters. In sum, there was **no** evidence supporting the request for recusal. The Movants tried to obtain under § 455(b)(1) or § 455(a) the recusal that they could not obtain under § 455(b)(3)—but without evidence of the elements of actual bias or reasonableness in questioning the Judge's impartiality.

When the innuendo and false allegations were stripped away and the true facts were considered, recusal was not proper.  There is no statute that provides that a judge must recuse if, during his service in governmental employment, he had an adversarial relationship in his official capacity with a party who later comes before him in an *unrelated matter*—which was the circumstance

24

presented by the Motion to Disgorge.  And there was no evidence showing that the Judge was biased or that it was reasonable to question his impartiality, such as requiring recusal under § 455(b)(1) or § 455(a).

**2. Likelihood of success on the merits of the appeal based on the argument that recusal was required because of acts of the Court during the litigation of the Motion to Disgorge.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal based on the argument that recusal was required based on certain acts of the Court during this Case:

Mr. Robinson alleges that the Judge "took on the role of an advocate for the [D]ebtor instead of a neutral judicial officer." Mr. Robinson points to nothing in support of this contention.  In previous motions, the Movants have alleged that the Judge "advocated" by: directing that the Motion to Disgorge that was mis-docketed by the pro se Debtor be properly docketed; declining to dismiss the Motion to Disgorge when the Debtor was late for one hearing (although they did not complain when the Court did not grant the Motion to Disgorge without a hearing when they failed to timely file their response to the Motion to Disgorge); declining to dismiss the Motion to Disgorge based on the Movants' allegations of the Debtor's "unclean hands"; allowing the Debtor to orally reply to Mr. Robinson's and Critique Services L.L.C.'s late-filed and improperly served response to the Motion to Disgorge; and allowing the Debtor to proceed before the Court at all.  These arguments were addressed in the Memorandum Opinion.

Mr. Robinson alleges that the Judge "took offense at" the First Motion to Recuse and the Motion to Dismiss.  Mr. Robinson provided no evidence in support of this claim; he merely pointed to the orders denying these motions.  Judicial rulings are almost never a ground for recusal based on bias.  Moreover, the orders do not support the allegation that "offense" was taken. Mr. Robinson conflates the Court being unimpressed with his arguments with the Judge being offended by them. He also seems to believe that he is entitled to orders in which the Court feigns being impressed with the unimpressive. The denial of the

motions—even if done without false solicitiousness—is not evidence of "offense," much less of bias.

The Movants' sanctionable behavior was, indeed, an affront to the Court's authority—as sanctionable acts are, by definition, an affront to the Court's authority. However, the Court recognizing this affront is not evidence of judicial bias. Compare this, for example, with *Cunningham v. Ayers (In re Johnson)*, 921 F.2d 585 (5th Cir. 1991). In that case, the appellate court determined that the presiding judge should have recused himself because "[t]he record makes clear that [the judge] considered [the sanctioned party's] actions to be a personal affront to his authority. [The judge] stated that he was 'prejudiced in this matter;' that he had 'all but made up [his] mind' as to what he was going to do in the case; that he was 'not in the least inclined to be neutral;' and that he was serving as 'complaining witness, prosecutor, judge, jury, and executioner' in the case." *Id.* at 587. Here, there is no evidence that the Judge considered the Movants' actions "to be a personal affront to his authority." Rather, the Movants' sanctionable actions were a professional affront to the Court's authority. Moreover, the Judge made no remarks even remotely similar to those comments made in *Cunningham v. Ayers*. If anything, the Court was patient with the Movants, enduring months of contempt and offering repeated opportunities for the sanctions to be purged before finally imposing sanctions on a final basis.

Mr. Robinson alleges that the Court's offer to him of a nonmonetary method for sanctions satisfaction is evidence of bias against him. However, he offers with no explanation as to how the Court's offer to cut him a break on his monetary sanctions is evidence of bias against him or is evidence that it is reasonable to question the Judge's impartiality. At first blush, his argument seems contrary to common sense. If anything, the offer seems to be evidence of a merciful predisposition toward Mr. Robinson. However, context explains the argument—Mr. Robinson was at the end of the line in terms of stalling sanctions. It did not matter that he was comfortable making the effectiveness of the proposed settlement agreement contingent on the Judge's approval of the agreement—strongly suggesting that, as recently as early April 2014, he had no

concerns about bias or the appearance of partiality based on the January offer. It was not until the proposed settlement agreement was not approved that he suddenly sought recusal on the claim that the January offer was somehow evidence of bias against him.

Mr. Robinson alleges that the notices regarding the Court's intent to impose sanctions against him were issued in "retaliation" for his rejection of the offer of an alternate method of sanctions satisfaction and for his filing of the Motions to Recuse and other pleadings. However, the notices were issued months after the offer of an alternate method of sanctions satisfaction. They were issued after the Court had been advised that settlement negotiations had collapsed—after which the Court determined that the time had come to take up the Motion to Disgorge (and all related sanctions) on a final basis. Despite Mr. Robinson's tired tripe of victimhood, the sanctions were not "retaliation." The sanctions were the result of the professional obligation of the Court to hold Mr. Robinson accountable on a final basis for the sanctionable behavior he undertook throughout the litigation of the Motion to Disgorge.

### 3. Likelihood of success on the merits of the appeal based on the argument that recusal was required under § 144.

Mr. Robinson argues that he is likely to succeed on the merits of his appeal based on the argument that § 144 required recusal. However, the plain language of § 144 provides that it does not apply to bankruptcy judges: "[w]henever a party to any proceeding *in a district court* makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein  . . . The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time." (emphasis added). Moreover, even if § 144 derivatively applied to bankruptcy judges, Mr. Walton's affidavit in support of the § 144 request was insufficient, for the reasons set forth in the Order Denying the Third Motion to Recuse.

### B. Likelihood of Success on the Merits of the Appeal Based on Arguments Other Than Those Based on Recusal

The Movants also argue that it is likely, based on other (non-recusal) grounds, that they will succeed on the merits of the appeal. The Court considers these other grounds here, and concludes that they do not support a finding of a likelihood of success on the merits of the appeal.

### 1. Likelihood of success on the merits of the appeal based any argument that rests on a generic legal citation.

Each of the Motions to Recuse is padded with proclamations such as the assertion that there is a "strong probability" that the Movant will succeed on the merits of the appeal because the Memorandum Opinion is "in violation of due process of law as Constitutionally and statutorily required, in an abuse of discretion and in violation of the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, the Local Rules of the [District] Court and the Local Rules of the [Bankruptcy] Court, and the substantive and procedural law." However, substantively devoid, generic citations such as these do not support a finding under Factor 1.

### 2. Likelihood of success on the merits of the appeal based on the argument that there is a "right" to practice before the Court.

The Movants argue that they are likely to succeed on the merits of the appeal because, they contend, the Memorandum Opinion interferes with Mr. Robinson's and Mr. Walton's "right" to practice before the Court. Practicing law before the Court is not a right; it is a privilege. A lawyer does not have a "right" to practice here merely because he has a bar card. To have the privilege to practice here, an attorney must to be in good standing with the Court, which Mr. Robinson and Mr. Walton are not.

### 3. Likelihood of success on the merits of the appeal based on the argument that Mr. Robinson and Critique Services L.L.C. cannot be required to file under seal certain information.

At page 7 of the Memorandum Opinion, the Court directs that Mr. Robinson and Critique Services L.L.C. file, under seal, certain information to

clarify their relationship (about which they made conflicting representations during the Case). Mr. Robinson asserts that he is likely to succeed on the merits of the appeal because, he alleges, this direction "compels discovery or production." The Court's direction does not "compel discovery." The Court's direction is separate from the Debtor's now-moot discovery requests. To the degree that any information required by the Court to be filed happens to overlap with a discovery request made by the Debtor, that overlap does not convert the Court's direction into one compelling discovery under Rule 37. For the same reason, the Court's direction does not "compel production." ("Production" is a litigation term associated with making discovery.) Again, the Court's direction is not an order compelling discovery by production.

In addition, the Movants' contention that the information that the Court requires to be filed is "personal, confidential and privileged" is baseless. The Movants have alleged no facts in support of this assertion; they just claim it as fact. However, the information involves no attorney-client confidential information. It involves no attorney work product. It relates to Mr. Robinson's relationship with Critique Services L.L.C. and how Critique Services L.L.C. operates its business—which is not personal, confidential or privileged, especially when Mr. Robinson and Critique Services L.L.C. made their business relationship an issue through their inconsistent representations. Moreover, even if the information were "personal, confidential, or privileged," the Court afforded considerable protection for this filing of this information. It may be filed under seal, whereupon it would be subject only to review without a motion only by the UST, the District Court, the OCDC, and the U.S. Attorney—entities that are highly unlikely to poach Mr. Robinson's clients or utilize any "trade secrets" (if any happen to exists, but of which there is no evidence).

4. **Likelihood of the success on the merits of the appeal based on the allegation that Mr. Robinson and Critique Services L.L.C. were denied their choice of counsel.**

The Movants argue that the Memorandum Opinion violates the U.S. Constitution, but fail to further develop this argument. To the degree that this may

be a Sixth Amendment "assistance of counsel" argument based on the denial on their last-minute efforts to have Mr. Walton withdraw, the Court notes that the Sixth Amendment begins: "In all criminal prosecutions . . . ."  The Motion to Disgorge was not a criminal prosecution.  And, to any degree, the Movants were not denied assistance of counsel or their choice of counsel.  While the Court generally shows deference to a party's choice of counsel in civil proceedings, the local rules still must be followed and this deference is not a license for a party to delay a proceeding.  Pursuant to Local Bankruptcy Rule ("L.B.R.") 2091(A),[30] an attorney may not withdraw from his notice of appearance unless the Court grants his motion to withdraw, regardless of whether the client has terminated him.[31]  Here, the Court did not find the last-minute efforts to withdraw to be made in good faith or that the allegations made in support to be persuasive on the papers.  The Movants offered no evidence of Mr. Walton's termination, other than their own word, which had little credibility at that point. Mr. Walton alleged that he had been terminated as a result of the Court's making of the offer for a nonmonetary, alternate method for sanctions satisfaction. He also claimed that he had a conflict with his clients.   However, these assertions were unsubstantiated and contradicted by the record. Mr. Walton continued to represent his clients for months after the January offer. It was not until mid-April 2014—after the Court

---

[30] The Court cited L.B.R. 2091 as a basis for its direction in its April 11, 2014 Order Striking the Notice of Dismissal [Docket No. 147]. However, on page 34 of the Memorandum Opinion, the Court incorrectly cited L.B.R. 209*3* as the rule requiring that an attorney file a motion to withdraw. However, the substantive point remains true: an attorney cannot withdraw from his appearance in a case before this Court unless it is done by motion.

[31] A party's termination of his counsel does not release that attorney from his appearance before this Court. An attorney can withdraw from his appearance before this Court only upon a motion granted by the Court. Ordinarily, the representation by an attorney that he has been terminated likely would be persuasive of the merits of a motion to withdraw as counsel. Here, however, the Court was not persuaded, merely by Mr. Walton's and Mr. Robinson's claim made in their papers that Mr. Walton had been terminated and that a conflict existed.  Because of Mr. Walton's and Mr. Robinson's lack of credibility (a result of a year's worth of misleading representations and bad faith behavior), the Court required an evidentiary hearing to determine whether withdrawal was proper.

denied the Motion to Compromise Controversy and did not approve the proposed settlement agreement—that Mr. Robinson, Critique Services L.L.C. and Mr. Walton suddenly claimed that Mr. Walton had been fired and that he needed to withdraw due to an alleged (but unspecified) conflict.[32] The Court denied the attempts to have Mr. Walton withdrawn, without prejudice to a motion to withdraw being filed and set for hearing and the taking of evidence. However, no new request to withdraw was ever filed and no evidentiary hearing was ever requested. And Mr. Walton continued to represent his clients in this Case and, then later, before the District Court on appeal.

### 5. Likelihood of success on the merits of the appeal based on the allegation that the Debtor had not advised as to the status of discovery before sanctions were imposed.

Mr. Robinson argues that he is likely to succeed on the merits of the appeal because, he contends, sanctions were imposed "despite the fact that the [D]ebtor had not advised the [C]ourt that she had not received [the discovery] documents." However, the Debtor advised the Court in September that she had

---

[32] The Movants' efforts to have Mr. Walton withdrawn were as follows. First, on April 10, 2014, Mr. Walton filed a "Motion to Withdraw as Attorney for Respondent Robinson d/b/a Critique Services L.L.C." [Docket No. 141], alleging that Mr. Robinson and Critique Services L.L.C. consented to Mr. Walton's withdrawal from the Case. In complement, Mr. Robinson filed a "Notice of Dismissal of Legal Counsel and Election to Proceed Pro Se" [Docket No. 142], claiming that he "dismissed" Mr. Walton (it was unclear whether he was purporting to dismiss Mr. Walton as Critique Services L.L.C.'s counsel, as well). However, a debtor's "dismissal" of his counsel does not withdraw that attorney from his appearance. Accordingly, on April 10, 2014, the Court entered an Order Denying Motion to Withdraw as Attorney at Docket No. 143], and on April 11, 2014, the Court entered an Order striking the Notice of Dismissal of Legal Counsel [Docket No. 147]. Next, Mr. Walton and Mr. Robinson attempted Mr. Walton's withdrawal by self-declared fiat. On April 11, 2014, they filed a "Motion to Substitute Robinson for Walton as Attorney for Robinson d/b/a Critique Services L.L.C." [Docket No. 151], stating that Mr. Walton had a conflict, and declaring that Mr. Walton withdrew and Mr. Robinson substituted himself as counsel. That is, Mr. Robinson and Mr. Walton attempted to do by "substitution" that which the Court had disallowed without an evidentiary hearing. Later that day, the Court entered an order [Docket No. 155] denying by endorsement the Motion to Substitute, providing that: "Attorneys' word alone not credible; no substitution without [e]videntiary hearing; none requested."

not received the discovery. Mr. Robinson and Critique Services admitted at the October 1 hearing that they had not provided the discovery. No representation had been made since then that the Debtor received the discovery. And it remains true to this day that the Debtor never received the discovery.  Mr. Robinson does not even suggest that he actually made the discovery; he merely complains that the Court somehow jumped the gun by sanctioning him for refusing to make the discovery.

**6. Likelihood of success on the merits of the appeal based on the allegation that the disgorgement amount was excessive.**

Mr. Robinson argues that it is likely that he will succeed on the merits of the appeal because, he contends, the $495.00 ordered to be disgorged is in excess of the amount paid to him for legal fees. However, pursuant to Rule 37(b)(2)(A), Mr. Robinson was deemed to have admitted all well-pleaded facts in the Motion to Disgorge, including the allegation that the Debtor paid $495.00 for legal services. Mr. Robinson is bound by his admissions of the facts alleged.

**7. Likelihood of success on the merits of the appeal based on the allegation that the Debtor had "unclean hands."**

Mr. Robinson argues that it is likely that he will succeed on the merits of the appeal because, he contends, the Debtor had "unclean hands." Had Mr. Robinson and Critique Services L.L.C. participated in discovery and allowed this matter to go to an evidentiary hearing, they might have been able to raise the issue of the Debtor's credibility and culpability in their defense.  However, they refused to participate in discovery, and thereby denied themselves the opportunity to raise the allegations properly for the Court's consideration.  But the mere making of this allegation did not make lawful their refusal to obey the Order Compelling Discovery, and does not now make likely his success on the merits of the appeal.

**8. Likelihood of success on the merits of the appeal based on the allegation that the suspensions were a surprise.**

Mr. Robinson and Mr. Walton argue that it is likely that they will succeed on the merits of the appeal because, they claim, their suspensions were a

surprise. However, Mr. Robinson and Critique Services L.L.C. had been in contempt of Court for months. They had received escalating sanctions and refused to perform pursuant to his discovery obligations to purge the sanctions. They refused satisfy the sanctions. They were warned repeatedly and specifically that the Court was considering imposing additional sanctions on a final basis. They were given multiple chances to respond to the prospect of additional sanctions.  Likewise, for months, Mr. Walton had facilitated and promoted his clients' contempt through his abuse of judicial process, vexatious litigation and other bad acts.  He was given notice that the Court was considering the imposition of sanctions against him.  The Court even advised Mr. Robinson and Mr. Walton that they faced the specific possibility of a loss of privileges with the Court: "the Court encourages [Mr. Robinson and Critique Services L.L.C.] and Mr. Walton to respond by the April 28th deadline by filing a Brief in Response. This is not a minor matter.  It may result in monetary sanctions and/or the revocation of privileges with this Court."  (Order Denying Third Motion to Recuse at 11.)  And, even after this warning, neither Mr. Robinson nor Mr. Walton showed that sanctions should not be imposed.  For the most part, in their responses, they simply denied that they had done anything sanctionable, despite the clear record to the contrary.

### 9. Likelihood of success on the merits of the appeal based on the allegation that Critique Services L.L.C. was not a party.

The Movants argue that it is likely to succeed on the merits of the appeal because they were denied due process; Mr. Walton alleges that the Memorandum Opinion was "entered without jurisdiction over Critique Services L.L.C."  The Court construes this to include the argument that the Court lacked personal jurisdiction over Critique Services L.L.C., based on the allegation that Critique Services L.L.C. was not named as a party to the Motion to Disgorge. However, in the third line of the Motion to Disgorge, the Debtor names the respondents: Mr. Robinson and Critique Services L.L.C. But, even in the face of a representation as clear as this, the Court did not foreclose a challenge to the naming of the respondents. When the Court directed the re-docketing of the

Motion to Disgorge, it did not deem any particular person to be a respondent. It left open the argument that Critique Services L.L.C. was not a respondent. And, in the Scheduling Order [Docket No. 30] issued on April 8, 2013, the Court again declined to comment on whom might properly be a respondent to the Motion to Disgorge. Yet, on May 7, 2013, Mr. Walton entered a Notice of Appearance Docket No. 32] on behalf of "Mr. Robinson d/b/a Critique Services L.L.C.," admitting that Critique Services L.L.C. was one of the "Respondents"[33] (plural, not singular). Mr. Walton did not challenge whether his client, Critique Services L.L.C., was properly named as a party. To the contrary, he conceded it. As such, Critique Services L.L.C. admitted that it was a respondent to the Motion to Disgorge. And, for the next fourteen months thereafter, Mr. Walton continued to represent Critique Services L.L.C. and filed pleadings on its behalf.

**10. Likelihood of success on the merits of the appeal based on the fact that the sanctions were not first requested by the Debtor.**

Mr. Robinson argues that it is likely that he will succeed on the merits of the appeal because the Debtor did not move for the sanctions imposed. However, the Court did not need the Debtor's request or blessing to sanction the Movants. The Court's enforcement of its own orders is not contingent on whether the opposing side seeks sanctions. The Movants' accountability is not a matter left to the discretion of the Debtor to raise.

Mr. Robinson's argument shows that he fails to recognize what his circumstances were by April 2014—when the notices of the Court's intent to impose sanctions were entered. By then, the Debtor's relatively small-dollars disgorgement dispute was the least of Mr. Robinson's problems. Mr. Robinson had been in contempt for months for refusing to obey the Order Compelling Discovery, and there would be accountability for that contempt unless the

---

[33] Mr. Walton's representations and acts on behalf of Critique Services L.L.C. throughout the litigation of the Motion to Disgorge clearly show that Critique Services L.L.C. admitted to being a respondent to the motion. If Critique Services L.L.C. now regrets those representations made its behalf by Mr. Walton, rewriting history is not a remedy for a poorly considered representation made on a party's behalf by its counsel.

sanctions were purged by the making of the discovery. And, that accountability could not be "negotiated away" by a settlement of the Motion to Disgorge. Neither the Movants nor the Debtor had the authority to make the Court's sanctions disappear, merely by settling the disputes between them. If Mr. Robinson had wanted to settle the Motion to Disgorge to avoid making discovery, his time for doing so was before discovery was compelled. Once the Court entered *its* (that is, the Court's—not the Debtor's) Order Compelling Discovery, Mr. Robinson's refusal to make the discovery went from being merely a frustration to the Debtor to an act of defiance of a court order. The difference is considerable; the consequences of the latter could not be avoided by Mr. Robinson later agreeing to settle his dispute with the Debtor.

### 11. Likelihood of success on the merits of the appeal based on the argument that the value of pro bono legal services cannot be the basis of attorney's fees sanctions.

The Debtor proceeded pro se when she filed her Motion to Disgorge. However, on June 17, 2013, the Debtor's pro bono counsel filed a Notice of Appearance [Docket No. 38]. Accordingly, throughout the discovery process, the Debtor was represented on a pro bono basis by counsel.

Mr. Robinson argues that he is likely to succeed on the merits of the appeal because attorney's fees sanctions were imposed for the value of the legal services rendered by the Debtor's pro bono counsel. Mr. Robinson cites no authority for the proposition that a bad-acting party is entitled to be the inadvertent beneficiary of a pro bono relationship between the opposing party and her counsel, and cannot be sanctioned for the value of opposing counsel's pro bono legal services. Moreover, his argument is contrary to public policy. Mr. Robinson's theory would punish the innocent for the benefit of the bad actor. Pro bono counsel would be subject to having his time and resources wasted, and pro bono clients would be subject to a bad actor's undeterred behavior.[34]

---

[34] The Court specifically did not interfere with the pro bono nature of the attorney-client relationship. The Debtor's attorneys will not financially benefit in any significant way from the sanctions. Only a small portion of the attorney's fees sanction ($1,710.00) was made payable to the Debtor's counsel under Rule 37.

**12. Likelihood of success on the merits of the appeal based on the fact that the attorney's fees sanctions included the value of legal services rendered by two attorneys.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because the value of legal services rendered by two pro bono attorneys (a partner and an associate) were included in the attorney's fees sanctions, even though only one of the attorneys (the associate) filed a notice of appearance. Both attorneys practice at the same firm. The Movants did not object to the affidavits regarding the Debtor's attorney's fees, even though the Court allowed them to respond to the affidavits. The Movants did not request a hearing on the issue of the alleged time spent or the value of the time spent. Despite all this, Mr. Robinson now claims that the Court could not sanction for the value of the partner's services, but cites no authority in support of this contention.

To the degree that Mr. Robinson's position could be construed as an argument that he is likely to succeed on the merits of the appeal on a challenge to the sanctions' reasonableness, the Court notes that it did not order that the Movants be sanctioned for the value of all time set forth in the affidavits. The Court considered for each time entry and indicated whether it was included or excluded in the sanctions total. Only the value of time spent on discovery-related matters was included, and the value of time spent on matters unrelated to discovery was excluded. Moreover, since there were two attorneys who spent time on the matter, the Court reviewed the affidavits for duplication of time (although it appeared that the Debtor's counsel ran the matter leanly). The Court even caught nominal errors in time entries and attributed the time correctly. In the end, the value of the majority of the time was excluded from the sanctions.

**13. The likelihood of success on the merits of the appeal based on the allegation the Motion to Disgorge had been withdrawn.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he falsely alleges, the Debtor withdrew her Motion to Compel

---

The majority of the attorney's fees sanctions was ordered to be paid to a legal services charity of the Debtor's counsel's choice.

Discovery.  Mr. Robinson relies on the April 10 Notice [Docket No. 146] filed by the Debtor, in which the Debtor advised that she could no longer accept discovery in light of the pending Motion to Compromise Controversy.[35] The Debtor represented that "for all intents and purposes" she considered the Motion to Compel Discovery withdrawn.  However, that representation—whatever it meant—had no legal effect in terms of withdrawing the document.  A motion is not withdrawn "for all intents and purposes."  It is either pending or disposed (that is, ruled upon, whether in part or in whole).  A motion is either withdrawn, pending or ruled upon.  Here, the Motion to Compel Discovery was not pending in April 2014 because it had been ruled upon in September 2013.  Because a moving party cannot withdraw a motion after its disposition, the Debtor could not have withdrawn the Motion to Compel Discovery in April 2014.  More importantly, though: even if the Motion to Disgorge had been withdrawn—on the theory, perhaps, that the Order Compelling Discovery had been granted on an interim basis and the Debtor was withdrawing the Motion to Disgorge from consideration on a final basis—that withdrawal would have made no difference to the imposition of sanctions. The Movants still had spent months avoiding compliance with the Order Compelling Discovery.  Contempt is no less contemptuous because the order is interim.  To hold otherwise would mean that the Court has no ability to enforce compliance with an interim order.

**14. Likelihood of success on the merits of the appeal based on the allegation that the Motion to Disgorge had been settled.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he falsely alleges, the Motion to Disgorge had been settled pursuant to the proposed settlement agreement offered in support of the Motion

---

[35] The Motion to Compromise Controversy, if it had been granted, would have resolved all matters and relieved Mr. Robinson and Critique Services L.L.C. of the obligation to make discovery going forward.  However, its approval also would have ended Mr. Robinson and Critique Services L.L.C.'s ability to purge the sanctions by the making of discovery.  Thus, the already-accrued sanctions would have been imposed on a final basis because they were never purged.

to Compromise Controversy [Docket No. 144].   A copy of that proposed settlement agreement is attached hereto as Attachment E.[36]

On March 22, 2014, the Debtor filed a Notice with the Court, advising that settlement negotiations between and among the parties had collapsed. However, at some point thereafter, settlement efforts were renewed informally. On April 10, 2014, the Debtor filed her Motion to Compromise Controversy, in which she asked that the Court approve a global settlement of all disputes among and between the Debtor, Mr. Robinson, Critique Services L.L.C. and the defendants in Adversary Proceeding 13-4284, as set forth in the proposed settlement agreement. However, because the Motion to Compromise Controversy failed to satisfy Bankruptcy Rule 9019, the Court was required to deny it.   Although the denial was without prejudice to the motion being renewed, on terms that satisfied Bankruptcy Rule 9019, a renewed request to compromise the controversy was never filed.

Because the Motion to Compromise Controversy was never granted and thus the proposed settlement agreement was never approved, the Motion to Disgorge was never settled.[37]  The Movants' assertion that the Motion to

---

[36] On April 3, 2014, the Court entered an order [Adv. Proc. No. 13-4284 Docket No. 24], granting the Debtor's motion to file the proposed settlement agreement under seal, upon the representation that the proposed settlement agreement contained material that should be protected.  However, as the Court noted in its April 28, 2014 Order Denying the Motion to Compromise Controversy [Docket No. 177], the proposed settlement agreement contained no such information needing protection.  Mr. Robinson now makes the false allegation that the Motion to Disgorge was settled, putting at issue the terms of the proposed settlement agreement.  Because that allegation is shown to be false by the terms of the proposed settlement agreement, the Court attaches a copy hereto.  Moreover, the unsealing of the document is proper under § 107(b), which permits the Court to protect trade secret or confidential research, development, or commercial information, or protect a person from scandalous or defamatory matter.  The proposed settlement agreement contains no such information.

[37] The Court notes that the denial of the settlement was without prejudice to the request being filed again, provided that the parties satisfied certain conditions, including the requirements of Bankruptcy Rule 9019.  No revised motion to compromise controversy was filed.

Disgorge was settled is shown to be false by Paragraphs 3 and 4 of the proposed settlement agreement, where the parties agree that the proposed settlement agreement is not effective without Court approval.  Moreover, even if the parties had not so agreed, reaching settlement terms regarding a claim that affects the estate (such as the claim for disgorgement here[38]) does not make such proposed settlement effective.  Without Court approval, such an agreement is unenforceable.

15. **Likelihood of success on the merits of the appeal based on the fact that the Court ordered the Debtor to accept discovery, if it was offered, to ensure that Mr. Robinson's and Critique Services L.L.C's purgation opportunity was not cut off before the Court-set deadline of April 11, 2014.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because the Court threatened the Debtor with sanctions if she did not accept discovery offered by the Debtor following the filing of the Motion to Compromise Controversy. This is a gross mischaracterization of the facts.  The Court directed the Debtor to accept discovery, if it was offered, for the benefit— not to the detriment—of Mr. Robinson and Critique Services L.L.C., to ensure that they were not deprived of any last minute opportunity to purge their sanctions by making the required discovery.

In its April 3 Notice, the Court gave Mr. Robinson and Critique Services L.L.C. until April 11, 2014 to make the required discovery. However, on April 10, 2014, the Debtor filed a notice in which she purported that she could no longer accept discovery, in light of the filing of the Motion to Compromise pending for approval.  This presented a possible unfairness to Mr. Robinson and Critique Services L.L.C., who were not joint movants on the Motion to Compromise Controversy.  Mr. Robinson and Critique Services L.L.C. had been given until the April 11 deadline to make the discovery—and making the discovery was the only

---

[38] Section 329(b) provides that disgorged attorney's fees may be ordered to be returned to the estate if the property would have been property of the estate, or to another entity that made the payment.  Here, any disgorged fees would be returned to the estate for distribution to unsecured creditors.

way they would be able to purge the sanctions and avoid having to satisfy the sanctions by payment. Even though it was a matter of only one day—and, as a practical matter, that there was little chance that Mr. Robinson and Critique Services L.L.C. would have a change of heart and make discovery in those waning hours—the Court could not permit Mr. Robinson and Critique Services L.L.C. to be deprived of this last minute opportunity to meet their discovery obligations. Accordingly, the Court entered an Order [Docket No. 148], directing that Mr. Robinson and Critique Services L.L.C. still had the chance to purge their sanctions by making the discovery, and the Debtor must accept discovery if it was offered, explaining:

> if . . . the Respondents [Mr. Robinson and Critique Services L.L.C.] attempt to make discovery before April 11, 2014 at 4:00 P.M., the Debtor may not decline to accept the discovery. She requested this discovery; she filed the Motion to Compel Discovery; and because of her efforts, the Order Compelling Discovery was entered. Just as the Respondents now are under a federal court order to make discovery, the Debtor has the reciprocal obligation to accept discovery, if it is offered. If the Respondents make the discovery at the last minute, and that results in the proposed settlement agreement being blown up, then so be it. The Debtor, perhaps inadvertently, created that possibility by presenting the proposed settlement agreement for consideration at this point. But the Court will not now deny the Respondents their last opportunity to purge their significant monetary sanctions.

16. **Likelihood of success on the merits of the appeal based on the fact that the Court directed the Clerk's Office to correct an incorrect caption of an electronic docket entry.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because the Court modified an April 11, 2014 electronic docket entry caption. This argument was addressed on page 57 of the Memorandum Opinion:

> On April 11, 2014, the Debtor filed a document captioned "Notice from Debtor related to Debtor's Motion to Compel Discovery." For reasons unknown, the Debtor described the document on the electronic docket as "Correspondence, Withdrawal of Document." However, the document was not correspondence and it did not operate to withdraw anything. The document provided that "for all intents and purposes the motion [to compel discovery] is withdrawn." This representation had no legal effect. A motion cannot be

> withdrawn for "all intents and purposes," and it cannot be withdrawn after its disposition. The electronic docket sheet's description of the document as correspondence or a withdrawal was incorrect and misleading.  Because the electronic docket is publicly available, the Court strives to maintain it so that it does not become a tool for incorrect or misleading representations.  Therefore, the Court directed the correction on the electronic docket sheet of the description so that it now reads as the exact title that the Debtor gave to the document—no more, no less, and no different.

Mr. Robinson points to no error in fact or law in support of his contention that the Court's direction to correct this inaccurate caption on its electronic docket sheet makes it likely that he will succeed on the merits of the appeal.  Moreover, the Court notes that the caption correction about which Mr. Robinson complains was not even the caption for a document that he filed.  It was for a document that the Debtor filed, and she did not complain about the correction.

**17. Likelihood of success on the merits of the appeal based on the argument that the Court cannot discipline attorneys directly.**

Mr. Robinson argues that it is likely that he will succeed on the merits of the appeal because, he contends, "the local rules of the Bankruptcy Court do not confer authority upon a single bankruptcy judge to suspend an attorney from practicing before the bankruptcy court." Mr. Robinson's understanding of the applicable rules is erroneous.

Bankruptcy courts "possess 'inherent power . . . to sanction 'abusive litigation practices.'" *Law v. Siegel*, 134 S.Ct. 1188, 1191 (2014)(quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-376 (2007)).  "This power is broad in scope, and includes the power to impose monetary sanctions, as well as to 'control admission to its bar and to discipline attorneys who appear before it.'" *In re Burnett*, 450 B.R. at 132 (Bankr. E.D. Ark. 2011)(quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), and citing *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005), and *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir. 1993)).  In addition, as the Court explains at page 95-96 of the Memorandum Opinion, the applicable local rules of this Court and the District Court also permit the Court to discipline an attorney:

the applicable local rules make it clear that the Court has the authority to discipline an attorney, including by suspending him. L.B.R. 2093-A provides that "[t]he professional conduct of attorneys appearing before this Court shall be governed by the Rules of Professional Conduct adopted by the Supreme Court of Missouri, the Rules of Disciplinary Enforcement of the United States District Court for the Eastern District of Missouri, and these Rules."  In addition, L.B.R. 2094-C provides that "[n]othing in this Rule shall preclude the Court from initiating its own attorney disciplinary proceedings regardless of whether an attorney has been disciplined by another court," and L.B.R. 2090-A provides that this Court adopts "[t]he requirements for . . . attorney discipline . . . outlined in Rules 12.01-12.05" of the Local Rules of the U.S. District Court (each, an "E.D.Mo. L.R.")

In turn, E.D.Mo. L.R. 12.02 provides that "a member of the bar of this Court and any attorney appearing in any action in this Court, for good cause shown and after having been given an opportunity to be heard, may be disbarred or otherwise disciplined," as provided in the U.S. District Court's Rules of Disciplinary Enforcement (each, an "E.D.Mo. R.D.E.").

And in turn, E.D.Mo. R.D.E. IV-A provides that "[f]or misconduct defined in these Rules, and for good cause shown, and after notice and opportunity to be heard, any attorney admitted to practice before this court may be disbarred, suspended from practice before this court, reprimanded or subjected to such other disciplinary action as the circumstances may warrant." E.D.Mo. R.D.E. IV-B defines conduct "which violates the Code of Professional Responsibility adopted by the Supreme Court of Missouri" may be grounds for discipline.

In the Memorandum Opinion, the Court also observed that "[d]isciplining an attorney by suspending him under E.D.Mo. L.R. 12.02 and E.D.Mo. RDE IV-A is not the same as bringing a 'formal disciplinary proceeding' against that attorney under E.D.Mo. R.D.E. V, whereby the court may refer the matter to counsel is appointed under E.D.Mo. R.D.E. X, for investigation and prosecution of the misconduct."

In his Motion for Stay, Mr. Robinson insists that E.D.Mo. R.D.E. Rule V prevents a judge from disciplining an attorney because it requires that a judge refer any misconduct to Rule X counsel for investigation and prosecution of a "formal disciplinary proceeding." This reading disregards the plain language of Rule V, which provides that "[w]hen misconduct . . . which, if substantiated, would

warrant discipline of an attorney . . . the judge *may* refer the matter to counsel appointed under Rule X for investigation and prosecution of a formal disciplinary proceeding . . ." (emphasis added).  "May" is not "shall."  The referral of a misconduct matter to Rule X counsel is permissive, not mandatory.

This argument also ignores the fact that Rule V is not the only avenue available for addressing misconduct.  Rule IV provides the Court authority to discipline an attorney, without requiring that a "formal disciplinary proceeding" involving an investigation and prosecution first be undertaken: "for good cause shown, and after notice and opportunity to be heard, an attorney admitted to practice before this Court may be disbarred, suspended from practice before this court, reprimanded or subjected to other such disciplinary actions as the circumstances may warrant."  Here, the Court declined to refer the matter for a "formal disciplinary proceeding" under Rule V. This was not a matter where the attorneys' actions required investigation.  There were no "suspected" activities to investigate; there were no unresolved issues of fact related to the violating behavior. The record in this Case firmly established that good cause existed to discipline Mr. Robison and Mr. Walton.

In addition, the Court notes that Mr. Robinson's argument appears to be undermined by the procedure employed by the District Court in its recent commencement of disciplinary actions against Mr. Robinson [District Court Case No. 13-MC-354] and Mr. Walton [District Court Case No. 13-MC-353].  In its June 30, 2014 orders commencing these disciplinary actions, the District Court did not mention a referral to a Rule X attorney for investigation; it simply commenced the disciplinary actions. The District Court did not indicate that its disposition would involve the investigation, prosecution or recommendation of a Rule X attorney.  Rather, it ordered that the disciplinary actions be stayed "until such time as the Office of Chief Disciplinary Counsel has completed its investigation and presented its findings and recommendation to the Missouri Supreme Court for final disciplinary action, if any.  If disciplinary action is taken by the Missouri Supreme Court, this matter will resume in the District Court with an Order to

Show Cause directing Mr. Robinson to demonstrate why reciprocal discipline should not be imposed by the District Court."

And last, Mr. Robinson's argument is not supported by the well-established law that permits a federal court, including a bankruptcy court, to discipline attorneys who abuse its process and otherwise conduct themselves in violation of the law and rules. Mr. Robinson seeks to denude the Court of its disciplining authority by making attorney discipline determinations mandatorily subject to the determination of a Rule X attorney.

**18. Likelihood of success on the merits of the appeal based on the argument that the Court could not sanction Critique Services L.L.C. because of the *Diltz* Order.**

Critique Services L.L.C. argues that it is likely to succeed on the merits of the appeal because the sanctions interfere with its "right to conduct its business"—a "right" that Critique Services L.L.C. seems to suggest was created by the *Diltz* Order.  This is the first time that Critique Services L.L.C. has argued that the *Diltz* Order provides it a "right to conduct its business" that provides immunity from suit or from sanctions.[39]

The contention that the *Diltz* Order gives to Critique Services L.L.C. a "right to conduct its business"—unaccountable, apparently, to anyone other than the UST—is false. The *Diltz* Order settled a dispute between the UST and the defendants in that adversary proceeding—period.  It does not give to Critique Services L.L.C. the right to avoid lawful discovery about its business. It does not give Critique Services L.L.C. a license to conduct its business however it wants without incurring liability.  It does not shield Critique Services L.L.C. from litigation.  It does not deprive other persons of the right to seek relief from Critique Services L.L.C. The *Diltz* Order does not provide Critique Services L.L.C. with a free pass on its business practices.

Moreover, Critique Services L.L.C's self-assessment that it has "abided" by the terms of the agreement is unpersuasive.  In the *Diltz* Order, "Defendant

---

[39] The Court notes that, even if the *Diltz* Order provided Critique Services L.L.C. such protection, Critique Services L.L.C. failed to timely make that argument.

Diltz and Her Interests" (which includes Critique Services L.L.C.)[40] agreed:

- not to directly or indirectly through others meet with bankruptcy clients or create bankruptcy documents for consideration other than to file a bankruptcy petition for herself or for the bankruptcy case of any of Her Interests. However, in the Memorandum Opinion, the Court determined that Critique Services L.L.C., met with the Debtor, provided her legal advice, solicited information for inclusion on her petition papers, and prepared her bankruptcy documents.

- not to provide bankruptcy document preparation services to the general public.  However, the Debtor was a member of the general public, in the Memorandum Opinion, the Court determined that agents of Critique Services LLC provided her bankruptcy document preparation services.

- that the only services to be provided any attorney or business organization whose primary business is the practice of law in connection with bankruptcy case preparation are: office facilities and equipment; advertising and marketing; equipment and software training to the attorney, attorney's employees or the attorneys and employees of the business organization whose primary business is the practice of law; license of use of the proprietary name, trade and service mark "Critique Services"; software; telephone number; and bookkeeping related to payroll, receivables, payables and required government forms, excepting bankruptcy-related documents.  However, in the Memorandum Opinion, the Court determined that Critique Services L.L.C. provided to Mr. Robinson services that included preparation of bankruptcy documents and intake for prospective and current bankruptcy clients.

- not to provide bankruptcy document preparation services to the public. However, in the Memorandum Opinion, the Court determined that Critique Services L.L.C. participated in bankruptcy petition preparation and

---

[40] Pursuant to the *Diltz* Order, the phrase "Defendant Diltz and Her Interests" includes "Defendant Diltz, on behalf of herself, any entity, or person which she now or in the future controls, including but not limited to Critique Services, L.L.C. d/b/a Critique Services."

soliciated false information to include in the papers of the Debtor.

- that any business relationship with an attorney must be pursuant to a contract, and the terms of which must state, among other things, that:
  - the attorney will meet with a prospective bankruptcy client before any non-attorney meets with such client. However, in the Memorandum Opinion, the Court found that the debtor did not meet with her attorney until after she met multiple times with, and received "advice" from, non-attorneys at Critique Services L.L.C.
  - the attorney agrees to preserve all notes and records relating to each attorney-client meeting, as well as memorialize the date of such meeting. However, in the Memorandum Opinion, the Court noted the grossly incomplete records regarding meetings and contact with the Debtor.
  - the attorney agrees that no client will be permitted to sign any bankruptcy petition created for the purpose of being filed unless and until the client has personally reviewed for accuracy that document with the attorney. However, in the Memorandum Opinion, the Court found that the Debtor did not review the petition papers before signing them, but simply signed where the documents had been tabbed by Critique Services L.LC. for her signature.
  - Critique Services L.L.C. will accept payment of monies under an agreement with an attorney only from the attorney and only upon presenting the attorney with a billing statement setting forth the particular services provided under the permissible services set out in the Critique Services L.L.C. Settlement Agreement. However, in the Memorandum Opinion, the Court found that the Debtor paid an agent of Critique Services L.L.C. directly. Moreover, throughout the Memorandum Opinion, the Court repeatedly found that Mr. Robinson and Critique Services L.L.C. refused to make any disclosure of their business relationship.

19. **Likelihood of success on the merits of the appeal based on the fact that the UST has not yet decided whether she will take action against Critique Services L.L.C. or Mr. Robinson in light of the allegations in the Motion to Disgorge.**

Critique Services L.L.C. appears to argue that it is likely to succeed on the merits of the appeal based on the fact that the UST has not yet decided whether her Office will take action against Mr. Robinson or Critique Services L.L.C., following her Office's recent investigation prompted by the allegations in the Motion to Disgorge.  The fact that the UST has not yet decided how she might act is hardly a ringing endorsement of Critique Services L.L.C.'s business practices and it does not suggest that Critique Services L.L.C. is likely to succeed on the merits of its appeal.

There is no document or other evidence in the record evidencing the UST's position on Critique Services L.L.C.'s business practices or on the Motion for Stay. If the UST had evidence to introduce or an argument to present on the issue of whether the stay should be granted, she could have filed a brief on the issue. But her silence cannot properly be construed as her support of Critique Services L.L.C.'s request for a stay or its merits on appeal.  And, to any degree, whatever the UST's opinion of Critique Services L.L.C.'s business practices or stay request may be, it does not overrule the Court's judgment on the Motion to Disgorge or the imposition of sanctions. The UST is part of the Executive Branch, not the Judicial Branch.  The UST does not sit in appellate review of this Court and her opinion does not determine matters that are brought before this Court.

The injection of the UST's purported opinion as relevant to the Motion for Stay is entirely the doing of Critique Services L.L.C.  The UST has not remotely suggested this.  And, Critique Services L.L.C.'s contention about the UST's opinion was misleading from the beginning.  In its Original Motion for Stay, Critique Services L.L.C. attempted to put words in the UST's mouth by claiming that "the [UST's] office . . . found nothing untoward or improper about James Robinson's conduct."  However, shortly after the Original Motion for Stay was filed, Critique Services L.L.C. had to file a Motion to Amend [Docket No. 249], advising that, "it was brought to the attention of counsel for Critique Services,

LLC that the original statement in ¶ 5 may not have been accurate.  After reviewing the matter with the U.S. Trustee, Critique Services, LLC wishes to Amend its Motion for Stay accordingly."  Paragraph 5 in the Amended Motion for Stay [Docket No. 250] now reads: "An attorney from the [UST]'s office attended several dozen 341 hearings[41] of debtors represented by [Mr.] Robinson after the Debtor herein complained of his conduct and/or that of his staff and asked questions of those debtors.  The [UST] has taken no action as a result of that investigation and has yet to decide whether any action might be necessary."  The difference between these representations is significant.

### 20. Likelihood of success on the merits of the appeal based on the allegation that the sanctions under Bankruptcy Rule 9011(d) were imposed for discovery violations.

Bankruptcy Rule 9011(d) provides that subdivisions (a) – (c) (the signature, representations, and sanctions subsections) do not apply to "disclosures and discovery requests, responses, objections and motions that are subject to the provisions of Bankruptcy Rules 7026 through 7037."  Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he falsely alleges, the sanctions imposed under Bankruptcy Rule 9011 were imposed for acts described in Bankruptcy Rule 9011(d).  However, at pages 92-94 of the Memorandum Opinion, the Bankruptcy Court unequivocally states that the sanctions imposed under Bankruptcy Rule 9011 are imposed for the making of false statements about the presiding Judge in the First Motion to Recuse and the Motion for Leave to Appeal.   These false statements were not made in connection with "disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of [Bankruptcy] Rules 7026 through 7037."  Although the false statements were made in the Movants' effort to avoid

---

[41] "Hearings" are court proceedings over which a judge presides and which involve the taking of evidence or the making of argument.  "Proceedings" conducted pursuant to § 341 are not hearings and are not presided over by an officer of the Judicial Branch. Proceedings under § 341 are meetings, and—in a chapter 7 case—are conducted by the chapter 7 trustee assigned by the UST's panel of chapter 7 trustees.

making discovery, that fact did not convert the false statements into the types of representations specified in Bankruptcy Rule 9011(d).

This is not to say that the Movants did not make false and misleading representations in connection with the discovery process; they did.  They lied about the status and condition of discovery to be submitted; they lied about their intent to make discovery; they lied about whether they had timely objected to the discovery requests; they lied about whether they had made the required discovery. Their entire discovery response strategy appeared to be predicated on lying to stall and distract. However, the Movants were not sanctioned for these acts under Bankruptcy Rule 9011.

21. **Likelihood of success on the merits of the appeal based on the allegation that sanctions were imposed under Bankruptcy Rule 9011(c)(2)(B) after settlement.**

Bankruptcy Rule 9011(c)(2)(B) provides that "[m]onetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a . . . settlement of the claim made by or against the party which is, or whose attorneys are, to be sanctioned."  Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he falsely alleges, the Motion to Disgorge had been settled.   The Motion to Disgorge was never settled, as previously discussed herein at Part V.B.14.

22. **Likelihood of success on the merits of the appeal based on the allegation that sanctions were imposed under Bankruptcy Rule 9011(c)(2)(A) against a represented party.**

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he incorrectly asserts, Bankruptcy Rule 9011 prohibits the imposition of sanctions upon a represented party.  Bankruptcy Rule 9011 does not provide a blanket prohibition on the imposition of sanctions upon a represented party.  Bankruptcy Rule 9011(c)(2)(A) prohibits the imposition of *monetary* sanctions upon a represented party for violations of Bankruptcy Rule 9011(b)(2). However, at pages 92-94 of the Memorandum Opinion, the Court unequivocally states that it imposed no monetary sanctions under Bankruptcy Rule 9011. All sanctions imposed under Bankruptcy Rule 9011 were "directives

of a nonmonetary nature," as allowed against a represented party under Bankruptcy Rule 9011(c)(2)(A).

23. **Likelihood of success on the merits of the appeal based on the allegation that sanctions were imposed under Bankruptcy Rule 9011(c)(2)(B) without a show cause order.**

Bankruptcy Rule 9011(c)(1)(B) provides that "[o]n its own initiative, the court may enter an order . . . directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto."  Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he contends, the Court did not enter an order to show cause. However, in its April 21, 2014 Notice, the Court gave Mr. Robinson, Critique Services L.L.C. and Mr. Walton notice of its intent to impose sanctions for the making of false statements, including those made in connection with the recusal request.  The Court gave the Movants until April 28, 2014 to respond and each party so responded—clearly understanding that this was their opportunity to show cause as to why the Court should not impose the sanctions. The April 21 Notice operated as a show cause order and the Movants responded to it as to a show cause order.

24. **Likelihood of success on the merits of the appeal based on the argument that sanctions were imposed under Bankruptcy Rule 9011(c)(2)(B) without specific notice as to which conduct was in violation of Bankruptcy Rule 9011(b).**

Bankruptcy Rule 9011(c)(1)(B) also provides that  "[o]n its own initiative, the court may enter an order describing the specific conduct that appears to violate [Bankruptcy Rule 9011(b)] . . ." Mr. Robinson argues that he is likely to succeed on the merits of his appeal because, he contends, the Court failed to specify the conduct for which it was considering imposing sanctions. However, in the April 21 Notice, the Court advised that it intended to impose sanctions for:

> the numerous false representations and statements made by the Respondents [Mr. Robinson and Critique Services L.L.C.] through Mr. Walton, willfully and in bad faith, at hearings and in pleadings, during the course of the litigation of the Motion to Disgorge.  Those false statements and representations include, but are not limited to, the false representations made at hearings regarding the status of the Respondents' discovery responses and the Respondents' intent

to make discovery, and the false statements made about the presiding Judge's previous employment as the United States Trustee made in support of a demand for the Judge's disqualification. The sanctions contemplated by the Court are both monetary and nonmonetary in nature, and may be imposed pursuant to any statutory authority available to the Court. These sanctions may be in addition to any sanctions that may be imposed upon the Respondents related to their refusal to make discovery, and in addition to sanctions that may [be] impose[d] upon Mr. Walton for his vexatious and contumacious efforts to undermine the judicial process in his facilitation of the Respondents' refusal to make discovery.

This language gave notice that the Court intended to impose sanctions for the previous false statements, including false statements about the Judge's previous employment as the UST made in support of the request for recusal. The Movants were well-aware of the falseness of these statements about the Judge's previous employment as the UST, as the Court had noted the statements and their falseness in previous orders.

### 25. The likelihood of success on the merits of the appeal based on the fact no hearing was held before sanctions were imposed under Bankruptcy Rule 9011.

Mr. Robinson argues that he is likely to succeed on the merits of his appeal because the Court did not hold a hearing before imposing sanctions under Bankruptcy Rule 9011. However, such a hearing is not required for a party to be heard; they may be heard through their papers. Moreover, a hearing is not required where it is not necessary or requested. *Elbert Walton v. John LaBarge* (*In re Clark*), 223 F.3d 859, 864 (8th Cir. 2000)("The court may act [to impose sanctions] without a hearing if it has provided an opportunity for one but no parties in interest requested it."). The Movants did not request a hearing on the issue of whether the Court should impose sanctions, nor did they seek an opportunity to offer oral argument in support of their responses. They were not "denied" a hearing that they did not request. Moreover, the Court is not obligated to set a hearing sua sponte—especially when not even the respondents suggest that such a hearing is necessary or would be beneficial.

26. **Note regarding any argument that is based on the contention that the Court erred in imposing sanctions under Bankruptcy Rule 9011.**

In addition to the analysis offered under Part V.B.20-25, the Court notes that any argument in support of granting a stay of the Memorandum Opinion that rests on an alleged error in the imposition of sanctions under Bankruptcy Rule 9011 is unpersuasive. At page 94 of the Memorandum Opinion, the Court states that the sanctions imposed under Bankruptcy Rule 9011 also are imposed under § 105(a). Even if it was error to impose sanctions under Bankruptcy Rule 9011, those same sanctions were properly imposed under § 105(a).

## V.  FACTOR 2:

### *Whether the Movants would suffer irreparable injury if the stay is not granted*

The Movants allege that they would suffer an "irreparable injury" in the form of financial loss without a stay of the Memorandum Opinion. However, for the reasons set forth below, the Court **FINDS** that the Movants would not suffer an "irreparable injury" and **HOLDS** that Factor 2 does not weigh in favor of granting a stay pending appeal.

### A.  The Law on "Irreparable Injury."

An "injury" is damage or harm done to or suffered by person or thing. Compliance with the terms of a non-erroneous federal court order does not inflict an "injury"; it accomplishes justice. This is true even if the party against whom relief is ordered must comply with the terms of the order to the detriment of his interests. That detrimental result is not "an injury."

However, if a federal court order ultimately is reversed, then a party's compliance with its terms during the pendency of the appeal may result in an injury, if that compliance was to the detriment of the party's interests. However, the law does not protect from any and every injury that might be incurred by compliance with a later-reversed order. The law offers, through consideration of Factor 2, protection from an "irreparable injury"—but only under certain circumstances. The showing of an "irreparable injury," alone, is not usually dispositive of whether a stay should be granted. A stay is not proper to delay the

likely effect of an order, on the less-than-likely chance that the order will be reversed. A stay of an order is not intended to provide a way for a party to buy time before an order becomes effective, if that order is likely to be affirmed.

An "irreparable injury" is one where "legal remedies after the fact [would] be inadequate to restore the party seeking a stay if the stay is not granted . . ." *Federal Trade Commission v. Church & Dwight Co.,* 756 F.Supp.2d 81, 86 (D.C. Cir. 2010). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to satisfy Factor 2. *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.D.C. 1958). To be "irreparable," the injury "must be both certain and great; economic harms must threaten 'the very existence of the movant's business,' and the movant must substantiate the claim that irreparable injury is likely to occur." *Federal Trade Commission v. Church & Dwight Co.,* 756 F.Supp.2d at 86; *see Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 384 F. Supp.2d 1334, 1341 (S.D. Iowa 2005)(holding that the injury must be "certain and great and of such imminence that there is a clear and present need for equitable relief in order to qualify as 'irreparable.'" (citing *Iowa Utils. Bd.* V. F.C.C., 109 F.3d 418, 425) (8th Cir. 1996)). "The threat of unrecoverable economic loss" may qualify as irreparable harm. *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 384 F. Supp.2d at 1341 (internal citations omitted).

The Court notes that both Mr. Robinson and Mr. Walton argued that their clients would incur an irreparable injury if the stay is not granted. Setting aside the fact that they offered no evidence to show that their clients would suffer an "irreparable injury," an "irreparable injury" for purposes of Factor 2 is one that would be experienced by the movant. Mr. Robinson's and Mr. Walton's clients are not movants on the Motions to Stay. Accordingly, whether their clients would suffer an "irreparable injury" is not the proper inquiry. To give the most effect to the arguments made by Mr. Robinson and Mr. Walton regarding their clients, the Court will treat the arguments regarding their clients as having been brought for purpose of supporting Factor 3, which considers whether "other interest parties"

would suffer "substantial harm"—although, as the Court will discuss in Part VI, their arguments regarding their clients are no more persuasive of that factor.

### B.  Mr. Walton failed to show he would incur an "irreparable injury" if a stay is not granted.

There is no evidence that not granting a stay would result in an irreparable injury to Mr. Walton by an unrecoverable economic loss or by threatening the very existence of his business. According to the Clerk's Office records (memorandum attached at <u>Attachment F</u>), in 2013, Mr. Walton filed only twenty-four bankruptcy cases in this Court (of which twelve were chapter 7 cases, twelve were chapter 13 cases).[42]  In 2014, Mr. Walton filed only ten cases here (of which three were chapter 7 cases and seven were chapter 13 cases). Mr. Walton's average compensation for his chapter 7 cases was $360.86; his average compensation for his chapter 13 cases $3,263.15.   These numbers do not suggest that this Court is Mr. Walton's primary place of practice or that Mr. Walton's filings here are a principal source of revenue for him.  In addition, Mr. Walton offered no evidence to support the assertion that, as a result of his suspension, he would incur the type of economic loss from which his business cannot recover.  There is not even evidence that the suspension will disrupt Mr. Walton's economic viability.  Because Mr. Walton did not seek a hearing and did not want to present evidence on this issue, the Court has before it only the allegations made in the Walton Motion for Stay, which are not sufficient to establish an "irreparable injury."

### C.  Mr. Robinson failed to show he would incur an "irreparable injury" if a stay is not granted.

There is no evidence that not granting a stay would result in an irreparable injury to Mr. Robinson by an unrecoverable economic loss or by threatening the very existence of his business. There is no evidence as to what the economic effect of the Memorandum Opinion might be on Mr. Robinson. Mr. Robinson has made conflicting and seemingly irreconcilable representations to the Court regarding his relationship with Critique Services L.L.C.  He refuses to provide any

---

[42] In 2013, Mr. Walton also was counsel in four adversary proceedings.

clarification, much less any evidence, regarding what his business is, exactly, or how it operates. He repeatedly represented to this Court that Critique Services L.L.C., an artificial entity, is his d/b/a, then also represented that his d/b/a is the fictitious name "Critique Services." The Court has no idea how Mr. Robinson is affiliated with Critique Services L.L.C.—whether he is an employee, an owner, or an independent contractor. Critique Services L.L.C. refers in its Motion for Stay to a "contract" between Critique Services L.L.C. and Mr. Robinson, but provided no evidence of such contract. And the Court has no evidence of how, if at all, Mr. Robinson would be financially injured as an effect of the Memorandum Opinion— much less that he will suffer an "unrecoverable economic loss." Mr. Robinson just proclaims, with no evidence, that he would suffer the loss of "hundreds of thousands of dollars." It is not even clear if Mr. Robinson means that he personally would experience such a loss, or whether Critique Services L.L.C. would—or if there is a difference. In short, Mr. Robinson wants to refuse to disclose any details about his business, his relationship with Critique Services L.L.C., and how much income he makes, but nevertheless to stand on the assertion that the suspension will cause him irreparable harm.

There also is no evidence that "the very existence of Mr. Robinson's business" is threatened. Mr. Robinson has not been suspended from practicing law before every court, or every federal court, or even every bankruptcy court. He has not been suspended from practicing before this Court permanently or indefinitely. At this point, he simply cannot practice before this Court for one year. There is no evidence that this suspension threatens the very existence of Mr. Robinson's business. Even during his suspension, Mr. Robinson remains free to practice before any other court in which he is admitted and in good standing.

### D. Critique Services L.L.C. failed to show it would incur an "irreparable injury" if a stay is not granted.

Critique Services L.L.C. claims that it will be "grossly, adversely affected" by the Memorandum Opinion because its "business revenue generated from its contractual relationship with [Mr.] Robinson will be compromised." This unsupported claim is not evidence of an "irreparable injury." Moreover, as the

Court's records in other cases indicate, Mr. Briggs has filed dozens of Notices of Appearance in cases on behalf of Mr. Robinson's and Critique Services L.L.C.'s clients.  In addition, Mr. Robinson is not the only attorney affiliated with Critique Services L.L.C.  Mr. Alphonso Taborn and Mr. Dean Meriwether also appear on behalf of Critique Services L.L.C. clients. And nothing prevents Critique Services L.L.C. from hiring another, non-suspended attorney.   Therefore, while Mr. Robinson's suspension may be an inconvenience to Critique Services L.L.C., there is no evidence that it threatens the very existence of it business.

### E.  The Movants failed to show that, even if they would incur an "irreparable injury," a stay should be granted.

Even if compliance with the terms of the Memorandum Opinion would cause the Movants "irreparable injury," such "irreparable injury" still would not make it proper to grant a stay. As set forth herein, none of the other three factors have been satisfied—most notably, Factor 1, which requires the demonstration of a likelihood of success on appeal. *See, e.g., In re DiClemente*, 2012 WL 5211942, at *3 (holding that the showing of irreparable harm "alone is insufficient to grant a motion for stay, particularly where [the movant] has failed to demonstrate a likelihood of success on appeal."). In addition, under these circumstances, Factor 4 (discussed herein at Part VII) strongly suggests that the stay should not be granted on public harm grounds.  The facts found in the Memorandum Opinion and the Movants' acts after the entry of the Memorandum Opinion establish that permitting these attorneys to continue practicing before this Court would severely undermine the public's trust in the justice system and would present an immediate hazard to the public seeking counsel.  The real risk of injury to the public by the continued practice of these attorneys before this Court counters the concern of an "irreparable injury" that might befall the Movants in the less-than-likely scenario of success on the merits of the appeal.

## VI.  FACTOR 3:

### *Whether other interested parties would suffer substantial harm if the stay is granted*

Because the Court determined that Factor 1 and Factor 2 were not satisfied, it need not address Factor 3 and Factor 4. *Villareal v. United States*, 2013 WL 3200084, at *6 (D. Nev. Jun. 21, 2013)("Since the factors are conjunctive, the failure to meet the first two factors render[s] the remaining factors insignificant."). However, to be as thorough as possible, the Court nevertheless will consider the remaining two Factors.  As set forth below, the Court **FINDS** that the other interested party—the Debtor—would suffer substantial harm if the stay is granted, and **HOLDS** that Factor 3 does not weigh in favor of granting a stay pending appeal.

### A.  The Standard for Factor 3.

The Movants argue that "other interested parties" would be harmed if the stay is not granted.  However, it appears that the standard is not whether other interested parties would suffer substantial harm if the stay is *not* granted; it is whether other interested parties would suffer substantial harm if the stay *is* granted. As such, the Movants' argument that the stay should be granted because, without it, other interested parties would be harmed, is not persuasive for purposes of Factor 3.

### B.  The "Other Interested Parties" Element Is Not Satisfied.

Even if Factor 3 includes a consideration of whether other interested parties would suffer harm if the stay is not granted, none of the Movants established the "other interested parties" element. [43]   Mr. Walton and Mr. Robinson allege that their current and future clients and present employees are "interested parties." However, Mr. Robinson's and Mr. Walton's clients and

---

[43] Critique Services L.L.C. makes only a cursory argument in support of the satisfaction of Factor 3.  It is does not even pretend to identify any persons who might constitute "other interested parties."  Instead, it argues that Factor 3 has been satisfied on the assertion that Mr. Robinson has not neglected his duties to his clients.  However, this assertion is directly contrary to the Court's findings of fact in the Memorandum Opinion and does not address the elements of Factor 3.

employees had no standing to be heard on whether sanctions should have been imposed, and now have no standing to be heard on the issue of whether the Memorandum Opinion should be stayed. The fact that their clients and employees may be collaterally affected by the Memorandum Opinion does not make them "other interested parties" in this matter.

Moreover, even if collaterally affected persons, such as Mr. Robinson's and Mr. Walton's clients or employees or family or creditors and so forth, could be "interested parties," no such person has come forward. For example, no client has intervened or otherwise sought leave to be heard on the stay issue. There is no persuasive evidence as to the positions of Mr. Robinson's and Mr. Walton's clients. It is not even proper that Mr. Robinson and Mr. Walton purport to represent their clients' interests on the Motions to Stay, since they are suspended from representing any other person before this Court. The "interests" advocated by Mr. Robinson and Mr. Walton purportedly "on behalf" of their clients amount to self-serving proclamations about the (unsubstantiated) positions of their (actual and hypothetical) clients, whose interests they cannot represent here due to their suspensions.

### C. The "Substantial Harm" Element Is Not Satisfied by the Allegation that the Effect of the Memorandum Opinion Would Be that Mr. Robinson's and Mr. Walton's Clients Are Left Without Counsel.

In addition, even if Mr. Robinson's and Mr. Walton's clients are "other interested parties," there has not been a showing that they would suffer "irreparable harm." Mr. Walton and Mr. Robinson allege that their clients would be bereft of counsel without a stay. However, they have failed to show that Mr. Robinson's clients actually would be without counsel. As to Mr. Robinson's clients: it is a matter of public record that, post-suspension, many of Mr. Robinson's clients have been and will be represented by Mr. Briggs. In addition, Mr. Robinson is not the only attorney working under the auspices of Critique Services L.L.C. Moreover, even if there were not multiple other attorneys associated with Critique Services L.L.C. at the ready who could step-in for Mr. Robinson (or if the clients did not want those other attorneys representing them),

there is another simple solution to ensuring that Mr. Robinson's clients are not left without counsel as a result of his suspension: all Mr. Robinson has to do is file on his own behalf in the client's case a Motion to Withdraw, stating that he cannot represent the client due to this suspension, and requesting that the granting of his motion include a short continuation of the Case and an abatement of its deadlines, to allow his client obtain new counsel. Then, Mr. Robinson could return the unearned fees to the client (as he must do with unearned fees), so that the client could use those funds to obtain new counsel. Mr. Robinson could even contact the UST, whose office has been helpful in the past coordinating representation for clients in circumstances where a bankruptcy attorney can no longer represent his clients.  If Mr. Robinson really had his clients' best legal interests at heart, he could act to assist his clients in finding non-suspended counsel.  Similarly, there is no evidence that the circumstances of Mr. Walton's clients would warrant staying the Memorandum Opinion. In 2014, Mr. Walton filed only a handful of cases in this Court.  There is no evidence that these clients could not retain new counsel easily or that their cases would be jeopardized by a short continuance to allow them to find new counsel.

### D.  The "Substantial Harm" Element Is Not Satisfied by the Allegation that Mr. Robinson's and Critique Services L.L.C.'s Clients Would Be Harmed If Mr. Robinson and Critique Services L.L.C. Were Required to Comply with the Directive to File Certain Information.

Mr. Robinson and Critique Services L.L.C. also claim that their clients will be harmed unless a stay is granted because the Memorandum Opinion requires that they file information that would clarify the nature of their relationship. However, the required information relates to the operation and ownership of Critique Services L.L.C. and Mr. Robinson's relationship with Critique Services L.L.C. No information regarding any specific client is required, and the information that is required may be filed under seal. How Mr. Robinson's clients could be harmed by Mr. Robinson finally being forthright with this Court regarding his relationship with Critique Services L.L.C. and his business is not explained. This argument reflects Mr. Robinson and Critique Services L.L.C.'s desire to operate in the dark as to the truth about their business.

59

**E. The "Substantial Harm" Element Was Not Satisfied By Claim that Mr. Robinson's Clients Would Lose the Fees Paid for Legal Services Not Rendered Due to the Suspensions.**

Mr. Robinson and Mr. Walton state that, without a stay of the suspension, Mr. Robinson's clients will be harmed because they "will lose fees paid to [Mr.] Robinson for representation . . ." This position is contrary to the law. Whatever fees were paid to Mr. Robinson that he failed to earn as a result of his suspension must be returned. Mr. Robinson does not get to keep unearned fees. 11 U.S.C. § 329(b). The Court is concerned that Mr. Robinson plans to keep unearned fees paid to him for representation that he cannot now render due to his suspension. The proper treatment of client fees, which must be held in trust accounts until earned, is a serious legal and ethical matter. The Court forwards a copy of this Order to the UST, should her Office also be concerned about Mr. Robinson's statement, and to the OCDC, in supplement to the referral made in the Memorandum Opinion.

**F. The Debtor Would Suffer "Substantial Harm" if the Stay is Granted.**

Mr. Robinson hints at the argument that the Debtor would not suffer substantial harm because, he falsely alleges, the fees she paid for her legal services, that have been ordered disgorged, have already been returned to her. However, as the Court noted at page 84 of the Memorandum Opinion:

> [i]n her November 12, 2013 Declaration [Docket No. 99], the Debtor represents that [Mr.] Briggs . . . remitted to the Debtor's attorney a payment of $199.00. In the Declaration, it was represented that, in remitting these funds, Mr. Briggs indicated that the Debtor had paid him $199.00 for representation in a bankruptcy case that Mr. Briggs never filed. The Debtor's counsel advised that his client did not accept the remittance, to the degree that it may have constituted an effort at settlement, but that he would retain the funds as an offset against any future awards that the Debtor may obtain. To the degree that the $199.00 constitutes a payment from Critique Services L.L.C., such payment should be an offset as the Debtor's counsel indicated, and remitted to the chapter 7 trustee for administration, when the remainder of the $495.00 is remitted.

Mr. Robinson and Critique Services L.LC. were deemed to have admitted that the Debtor paid to them $495.00 for legal services. Accordingly, because

60

$199.00 is less than $495.00, Mr. Robinson and Critique Services L.L.C. have not returned all of the Debtor's fees ordered to be disgorged.

Other than this, the Movants' arguments do not even acknowledge the actual "other interested party," Ms. Steward—much less address what consequence the stay would have on her.  However, Ms. Steward is not merely an inconvenience whose interests can be disregarded.  She is not merely a target of personal attacks launched by the Movants in an effort to direct attention from their refusal to participate in discovery. She is the person who endured a year of the Movants' abuse of judicial process and endless efforts to deprive her of the chance to have her Motion to Disgorge adjudicated on the merits.  And, more importantly, she is an "other interested party" who would suffer substantial harm if the stay was granted.  If the stay is granted, Ms. Steward would be deprived of the justice to which she is entitled: a judgment against the Movants. Because of the Movants' actions in this Case, Ms. Steward was denied the opportunity to prosecute her Motion to Disgorge on the merits for over a year. When justice finally arrived, it included both disgorgement relief as well as sanctions.  Rule 37(b) sanctions were a consequence of the Movants' repeated and ongoing efforts to deprive Ms. Steward of the discovery to which she was entitled.  Those sanctions ensured that Ms. Steward would not have to meet the burden on her Motion to Disgorge crippled without the discovery. She clearly would be substantially harmed by a stay of the judgment in her favor.   In addition—as to the monetary and nonmonetary sanctions that are not part of the judgment in her favor on the Motion to Disgorge—Ms. Steward is an "other interested party" who would be substantially harmed if the stay was imposed as to those sanctions. She was harmed by the contempt and abuse that the Movants' visited upon the Court, and it is part of the justice administered in this Case that the Movants be held accountable for their wrongdoing before this Court, which directly affected the Debtor.

## VII.  FACTOR 4:

### *Whether the issuance of the stay will serve, or not harm, the public interest*

The Movants do not argue that a stay of the Memorandum Opinion would serve the public interest; they argue only that a stay would not harm the public interest.  However, the Court **FINDS** that the stay would affirmatively harm the public interest.  Accordingly, the Court **HOLDS** that Factor 4 does not weigh in favor of granting a stay pending appeal.

The Movants argue that a stay would not harm the public interest because—they claim—that Mr. Robinson and Mr. Walton have done nothing wrong.  This flatly ignores the Court's lengthy and specific findings in the Memorandum Opinion. The Movants do not point to any error in finding of fact made by the Court in its factual conclusions.  Instead, they simply rely on their self-serving, bald assertion that they did nothing sanctionable.

A stay would undermine the public's confidence in the finality of judgments and the timeliness of the judicial process. Further, the granting of a stay also would cause a more immediate harm to the public interest:  it would turn these two attorneys loose on the public again. They would be practicing in cases before the Court—free to continue, unabated and unaccountable, their bad faith, contempt, vexatious litigation, frivolous filings, and judicial abuse. The post-suspension record in this Court indicates that, if the stay was granted, Mr. Robinson and Mr. Walton would continue their assault on the judicial process. Their repeated post-suspension attempts to impermissibly practice before this Court is evidence that they feel utterly entitled to do whatever they want in their practice, regardless of the law. A stay of the Memorandum Opinion would unquestionably inflict harm to the public interest because it returns these attorneys to the active practice before this Court before they can be held accountable for their wrongdoing.

## VIII. CONCLUSION

The arguments in the Motions to Stay varied from the wholly non-specific on the low-end, to the poorly developed and weakly supported on the high-end.

The Motions to Stay read as if the Movants assumed that this Court would not seriously consider their merits.  It was as if they viewed the Bankruptcy Rule 8005 motions filed here merely as a pass-through, an inconvenience to address on the way to seeking stay relief before the U.S. District Court.  If that was the Movants' strategy, it was unfortunate.  The Court was prepared to consider any argument, at law or in equity, on the issue of whether stay was proper, even if on a modified basis.  It was prepared to set a supersedeas bond, if one had been requested.  It would have conducted oral arguments, if a hearing had been requested. It would have considered any sincere effort—even the smallest gesture of good faith—by the Movants to take responsibility for their bad acts before this Court, as evidence that the public's interest would not be harmed by a stay.  The Court recognized the significance of the effect of its Memorandum Opinion and would have embraced an opportunity to provide some relief upon a proper showing that it was warranted.  Instead, the Movants did not offer in the slightest basis, factually, legally, or equitably, for entering any stay relief.


DATED:  July 29, 2014                                      CHARLES E. RENDLEN, III
St. Louis, Missouri 63102                                   U.S. Bankruptcy Judge
mtc


**Copy Mailed To:**

**David Nelson Gunn**
Law Offices of Mueller & Haller, LLC DBA
The Bankruptcy Company
2025 S. Brentwood, Ste 206
Brentwood, MO 63144

**James Clifton Robinson**
Critique Services
3919 Washington Blvd.
St. Louis, MO 63108
**Elbert A. Walton, Jr.**
Metro Law Firm, LLC
2320 Chambers Road
St. Louis, MO 63136

**E. Rebecca Case**
7733 Forsyth Blvd. Suite 500
Saint Louis, MO 63105

**Office of U.S. Trustee**
111 South Tenth Street Suite 6353
St. Louis, MO 63102

# ATTACHMENT  A

# RETAINER AGREEMENT

By the signature below, the clients retains attorneys *James C. Robinson, Attorney d/b/a Critique Services, Dean Meriwether and Ross H. Briggs* as their co-counsel in this case. The client understands that not all of the foregoing attorneys are in the same firm but client consents to the entry of appearance of each attorney. The clients agrees to the division of fees between the forgoing attorneys since each of the foregoing attorneys assume joint responsibility for the representation of the client. Client understands that court appearances, responses to motions and pleadings on their behalf will be made by co-counsel during pendency of restrictions upon James C. Robinson.

Client hereby retains and employs Attorneys for the fee of:
_____ Int. $299.00 Single Petition    or    _____ Int. $349.00 for Joint Petition

By agreement with the Client, the above agreement includes the following services:

Analysis of financial situation and rendering of advice in determining filing of Bankruptcy Petition;
Preparation and filing of bankruptcy petition, schedules and statement of financial affairs that may be required;
Representation of the Client at the first scheduled 341 hearing and /or meeting of creditors.

By agreement with the Client, the above agreement does not include the following services:
Representation of Client in any discharge ability actions, judicial liens avoidances, relief from stay actions, stipulation agreement and any other adversary proceeding.
Preparation and filing of reaffirmation agreements and motions.
Representation of the Client in any contested matters involving a redemption.
Revising and updating of credit report data.
Appearance at continued 341 hearing, amendments to petition, additional copies of petition, letters to creditors and/or credit bureau, faxes to creditors, garnishment recovery.

Client agrees to review the petition and all documents for accuracy prior to the filing of the petition and assume all responsibility for error or omission after this point.
Client does understand that the bankruptcy petition cannot and will not be filed without all necessary and/or requested information.
Client does understand that it is necessary to complete a credit counseling course prior to the filing of the case and a financial management course within 45 days of the meeting of creditor hearing or discharge will be withheld, (additional fees apply)
Client understands that if their case is closed without discharge there is a $310.00 fee to reopen said case.
Client understands there will be no refunds issued after the signing of this agreement and court filing fee and all missing information listed on the attorney request form must be receive within 90 days of the initial consultation or your processing fees will be forfeited..

Client(s) affirms that her and/or she has read, understands and agrees to this agreement.

**Client Signature**

6-19-14

**Date**

Asa Mukena Pierce

**Client Signature**

**Date**

# ATTACHMENT  B

RECEIVED

UNITED STATES BANKRUPTCY COURT  FILED
EASTERN DISTRICT OF MISSOURI

APR 23  2 54 PM '03

In re:                                    )   Case No. 02-53575-172
                                          )   Adversary No.03-4003-172
Deborah E. Thompson                       )   Chapter 7
                 Debtor.                  )
                                          )
                                          )
Joel Pelofsky                             )
United States Trustee,                    )
Eastern District of Missouri              )   Honorable James J. Barta
                 Plaintiff                )   U.S. Bankruptcy Judge
           v.                             )
Mr. Ross Briggs,                          )
d/b/a/ Critique Legal Services            )
                 Defendant                )
 Ms. Beverly Holmes,                      )
d/b/a Critique Services,                  )
d/b/a Critique Legal Services             )
                 Defendant                )
                                          )


AGREED ORDER BETWEEN THE UNITED STATES TRUSTEE AND DEFENDANT,
ROSS BRIGGS


At Saint Louis, in this district, this 30th day of April, 2003.

The United States Trustee for the Eastern District of Missouri (hereinafter referred to as the

"U.S. Trustee"), by his attorney Martha M. Dahm,  filed a Complaint to Suspend Ross Briggs,

Esq. (Briggs) from the Practice of Law in the United States Bankruptcy Court for the Eastern

District of Missouri, for Sanctions Against Ms. Beverly Holmes and  Briggs and Other Relief as

Prayed on January 13, 2003.  Based upon the consent of the parties, the U.S. Trustee and Briggs,

represented by  Mr. David Lander, Esq., to this Agreed Order as indicated by their signatures

below,  the Court enters the following relief in complete satisfaction of the allegations of the

1

filed Complaint:

IT IS ORDERED:

1. Briggs shall pay $10,000.00 as and for settlement of this matter in six (6) equal monthly

installments commencing May 1, 2003 and on the first day of each month thereafter until paid in

full. This payment shall be paid in equal shares to the debtors for whom Briggs filed a Chapter 7

Petition from October 30, 2002 through November 14, 2002 ( see attached list A). Briggs shall

file verification with the U.S. Trustee's Office of such payments within 15 days after each

installment is distributed. Payment of unclaimed funds shall be made into the Registry of the

Court.

2. Briggs shall attend 10 hours of ethical or bankruptcy training, such as but not limited to, the

Missouri Bar Bankruptcy Seminar and the Chapter 13 Seminar, every year for the next three

years from the entry of this order. Said training will be monitored by the United States Trustee's

Office. Briggs shall provide the United States Trustee's Office with a copy of his annual report

of compliance to the Missouri Bar for Continuing Legal Education.

3. Briggs shall not file any new bankruptcy cases, directly or indirectly through others, in the

United States Bankruptcy Court for the Eastern District of Missouri for six months from the entry

of this order. Briggs shall continue as debtor's counsel in cases that have been previously filed

unless Briggs complies with Missouri Supreme Court Rules of Prof. Conduct 4-1.16, which

requires certain steps that must be taken by an attorney before he is allowed to withdraw as the

attorney of record.

4. Briggs, after the above-mentioned six-month period, shall only file bankruptcy cases that

2

have complete schedules, statements of financial affairs, matrixes, verification of matrixes, 2016(b) disclosures and all other such documents as required by the Code or Rules, unless there exists exigent circumstances for the filing of an emergency petition.

5.  In those cases which have not been reinstated or refiled (see attached list B), Briggs shall reimburse each debtor all filing fees paid in the cases within thirty days from the entry of this Order.  Briggs shall submit sufficient verification of payment to the United States Trustee's Office within thirty days thereafter. Payments required to be made pursuant to this paragraph are in addition to payments required to be made pursuant to paragraph 1 of this Agreed Order.

6.  Briggs shall comply with the bankruptcy code, bankruptcy rules and all local rules in his future representation of debtors.  This includes the following:

(A)  Briggs, or an associate or partner in the same firm, shall attend Section 341 meetings of creditors.

(B)  Briggs, or an associate or partner in the same firm, shall meet and consult with each client prior to filing a bankruptcy petition. At that meeting, counsel shall make adequate inquiry as to the financial condition of the client, including the client's assets and liabilities, and all other information reasonably necessary to prepare complete and accurate schedules.  Said meeting shall also include an explanation of the effects of bankruptcy on the client.

(C)  Briggs shall comply with the provisions of Section 329 of the Code and Bankruptcy Rule 2016, relating to the employment and fee payment by counsel in bankruptcy cases.

(D)  Briggs shall file complete and accurate schedules, statement of financial affairs and all other papers filed with the Court.  Said papers shall be filed after reasonable inquiry by Briggs as to the veracity of the information provided and after consultation with each client as required by

3

Bankruptcy Rule 9011.  All necessary bankruptcy documents and any amendments thereto shall be filed in a timely fashion.

(E)  Briggs shall comply with the Missouri Supreme Court Rules of Prof. Conduct, including Rule 4-5.3, which requires a lawyer to supervise his non-lawyer assistants.

7.  Briggs shall immediately notify in writing all clients not previously notified  in writing of his current address and/or change of employment status.  Verification of this should be submitted to the U.S. Trustee's Office within ten days from the entry of this order. He shall keep all clients and the Court informed as to his current business address and phone number.  Furthermore, he shall keep clients reasonably informed about the status of a matter and promptly comply with reasonable requests for information as provided for in Missouri Supreme Court Rules of Prof. Conduct 4-1.4, which requires reasonable communications with clients.

8.  It is ordered and the parties agree that this Order fully and finally resolves any and all disputes, claims, and controversies against Briggs involving the filing, failure to file or incomplete filing of bankruptcy documents by Briggs commencing on October 1, 2002 through January 13, 2003, the filing date of the U.S. Trustee's underlying Complaint.

By acknowledging his consent to this Agreed Order, Briggs denies liability on his part with respect to any matters covered by or otherwise referenced in this Order.  The parties consent to this Agreed Order solely for the purpose of compromise and settlement and to avoid the burden

4

and expense of continued litigation.

Approved as to form and content:

_____          Date: 4-25-03
Mr. Ross Briggs, Esq.

_____          Date: 4/25/03
Mr. David Lander, Esq.

_____          Date: April 24, 2003
Peter Lumaghi, Esq.
AUST
United States Trustee's Office

_____
James J. Barta
United States Bankruptcy Judge

5

```
Ch. 7 cases where Ross Briggs is Debtor's attorney
period - October 30, 2002 through November 14, 2002

QUERY NAME . . . . . SLATTY
LIBRARY NAME . . . . QRYLIB

FILE          LIBRARY      MEMBER       FORMAT
CMMDB         ACMSDTA      SL           FCMMDB
CMMPR         ACMSDTA      SL           FCMMPR

DATE . . . . . . . . 04/01/03
TIME . . . . . . . . 15:47:41

         To list cases by DA (or other D's prof)
```



```
04/01/03  15:47:41       Ch. 7 cases (Briggs - Dtr atty)      PAGE    1
```

| Court Case Number | Curr. Case Chapt. | Case Filed Date | Debtor Name Lnl | Dtr Atty Code |
|---|---|---|---|---|
| 02-52508 | 13 | 2002-10-30 | MARTIN, KEITH B. | 2137 |
| 02-52509 | 7N | 2002-10-30 | SMITH, SHIRLEY A. | |
| 02-52510 | 7N | 2002-10-30 | MOORE, ANNA | |
| 02-52511 | 7N | 2002-10-30 | CALDWELL, TAKEYSHA | |
| 02-52512 | 7N | 2002-10-30 | DUCLOS, ALISON L. | |
| 02-52513 | 7N | 2002-10-30 | GAVRANOVIC, NEDELJKO | |
| 02-52514 | 7N | 2002-10-30 | SEALS, GREGORY L. | |
| 02-52515 | 7N | 2002-10-30 | GRAHAM, MAY | |
| 02-52516 | 7N | 2002-10-30 | SHUMPERT, KEISHA MAR | |
| 02-52517 | 7N | 2002-10-30 | BETTS, ROSIE E. | |
| 02-52518 | 7A | 2002-10-30 | WHITE, SYLVESTER  JR | |
| 02-52519 | 7A | 2002-10-30 | BOYD, JAMES A. | |
| 02-52520 | 7A | 2002-10-30 | WILKINS, THOMAS C. | |
| 02-52521 | 7N | 2002-10-30 | BROOKS, STEPHANIE DO | |
| 02-52522 | 7N | 2002-10-30 | BLOUNT, DIONNE C. | |
| 02-52523 | 7A | 2002-10-30 | REDDEN, EDWARD C. | |
| 02-52524 | 7N | 2002-10-30 | VANCE, MISHESHY | |
| 02-52525 | 7N | 2002-10-30 | THORNTON, ISAAC | |
| 02-52526 | 7N | 2002-10-30 | SPRAGGINS, ANTHONY E | |
| 02-52527 | 7A | 2002-10-30 | SIMMONS, AUNDRA | |
| 02-52528 | 7N | 2002-10-30 | ROGERS, DWAYNE | |
| 02-52529 | 7A | 2002-10-30 | HAYES, CASTELLA | |
| 02-52530 | 7N | 2002-10-30 | GLADNEY, MARY | |
| 02-52531 | 7N | 2002-10-30 | ROBERTS, NICOLE | |
| 02-52532 | 7N | 2002-10-30 | MERRITT, LYDIA M. | |
| 02-52533 | 7N | 2002-10-30 | JOHNSON, CONSWALLAR | |
| 02-52534 | 7N | 2002-10-30 | WILLIAMS, ANDREW C. | |
| 02-52535 | 7N | 2002-10-30 | BELL, PAMELA | |
| 02-52536 | 7N | 2002-10-30 | WASHINGTON, RACHEL A | |
| 02-52555 | 7N | 2002-10-30 | RAMSEY, MAURICE | |
| 02-52556 | 7N | 2002-10-30 | BLACKMON, ROBERT | |
| 02-52557 | 7N | 2002-10-30 | CALVIN, LA NITA M. | |
| 02-52558 | 7A | 2002-10-30 | MCCALL-TYLER, ERIKA | |
| 02-52568 | 7N | 2002-10-30 | BRYANT, SELWYN T. | |
| 02-52569 | 7N | 2002-10-30 | TERRY, PAMELA | |
| 02-52570 | 7N | 2002-10-30 | HARRIS, BRENITRA M. | |
| 02-52571 | 7N | 2002-10-30 | HAYMORE, TYRELL | |
| 02-52572 | 7N | 2002-10-30 | PERKINS, RODNEY B. | |
| 02-52573 | 7N | 2002-10-30 | CLAYTON, JONATHAN | |
| 02-52574 | 7N | 2002-10-30 | LOVE, JERRY | |
| 02-52575 | 7N | 2002-10-30 | ECHOLS, CHRISTENE | |
| 02-52576 | 7N | 2002-10-30 | MARTIN, ROBERT | |
| 02-52577 | 7N | 2002-10-30 | GLOVER, EDDIE | |
| 02-52578 | 7N | 2002-10-30 | KEYS, RAMONA | |
| 02-52579 | 7N | 2002-10-30 | ROSS, KENNETH | |
| 02-52580 | 7A | 2002-10-30 | BONNER, JACQUELINE | |
| 02-52581 | 7A | 2002-10-30 | SCHNELT, DAVID L. | |
| 02-52650 | 7N | 2002-10-31 | BANKS, LOUISE | |
| 02-52651 | 7N | 2002-10-31 | LOVE, SHIRLEY B. | |

```
04/01/03  15:47:41      Ch. 7 cases (Briggs - Dtr atty)     PAGE    2
```

| Court Case Number | Curr. Case Chapt. | Case Filed Date | Debtor Name Ln1 | Dtr Atty Code |
|---|---|---|---|---|
| 02-52652 | 7N | 2002-10-31 | MILLER, ADRIENNE | 2137 |
| 02-52653 | 7N | 2002-10-31 | THOMAS, SHARON DENIS | |
| 02-52654 | 7N | 2002-10-31 | BLACKWELL, AMY A. | |
| 02-52655 | 7N | 2002-10-31 | COLEMAN, CHRISTOPHER | |
| 02-52656 | 7N | 2002-10-31 | DAVIS, LAURA MARIE | |
| 02-52657 | 7A | 2002-10-31 | CAMPBELL, DIANE LARK | |
| 02-52658 | 7A | 2002-10-31 | BEAUREGARD SMITH, PA | |
| 02-52659 | 7N | 2002-10-31 | REED, JAMES | |
| 02-52675 | 7N | 2002-11-01 | MOORE, BRYANT LEMOUN | |
| 02-52676 | 7N | 2002-11-01 | BRANCH, AARON R. | |
| 02-52677 | 7N | 2002-11-01 | BROWN, VIVIAN | |
| 02-52678 | 7A | 2002-11-01 | BALL, DEVON G. | |
| 02-52679 | 7A | 2002-11-01 | BROOKS, JOHN HEURY | |
| 02-52680 | 7N | 2002-11-01 | GOLDSBY, DOROTHY MAE | |
| 02-52681 | 7N | 2002-11-01 | MOLETT, RAY LASHAWN | |
| 02-52682 | 7N | 2002-11-01 | MCGOWAN, GENTRY | |
| 02-52683 | 7N | 2002-11-01 | MASSEY, DARLEASE REG | |
| 02-52684 | 7N | 2002-11-01 | MCCOY, CECILE | |
| 02-52685 | 7N | 2002-11-01 | MADISON, KATIE L. | |
| 02-52686 | 7N | 2002-11-01 | GASSOWAY, DORIS JEAN | |
| 02-52687 | 7N | 2002-11-01 | PRINCE, MARION | |
| 02-52688 | 7N | 2002-11-01 | HARRIS, SOPHORNIA | |
| 02-52689 | 7N | 2002-11-01 | HELM, CHERYL DIANE D | |
| 02-52690 | 7N | 2002-11-01 | HODGE, ROSALINE JUNI | |
| 02-52691 | 7N | 2002-11-01 | JACKSON, ANGELA Y. | |
| 02-52692 | 7N | 2002-11-01 | JOHNSON, EUGENE | |
| 02-52693 | 7N | 2002-11-01 | KENNARD, KRYSTAL FAY | |
| 02-52694 | 7A | 2002-11-01 | LEE, LATASHA | |
| 02-52696 | 7N | 2002-11-01 | WILBURN, DARRELL | |
| 02-52697 | 7A | 2002-11-01 | WAGNER, JUANDELL | |
| 02-52698 | 7A | 2002-11-01 | TAYLOR, KENT T. | |
| 02-52699 | 7N | 2002-11-01 | TOLLIVER, ALLISON | |
| 02-52700 | 7N | 2002-11-01 | TYLER, YOLANDA L. | |
| 02-52701 | 7A | 2002-11-01 | ECKLES, LAVETTE | |
| 02-52702 | 7N | 2002-11-01 | RICHARDSON-STEPP, TA | |
| 02-52703 | 7N | 2002-11-01 | RICHARDSON, MELANIE | |
| 02-52704 | 7N | 2002-11-01 | PATTERSON, ELIZABETH | |
| 02-52705 | 7N | 2002-11-01 | PARGO, DENNIS L. JR. | |
| 02-52706 | 7N | 2002-11-01 | NICHOLS, THOMAS CHAR | |
| 02-52707 | 7A | 2002-11-01 | WHITFIELD, DAISY I. | |
| 02-52708 | 7N | 2002-11-01 | ZAMACONA, JOSE | |
| 02-52709 | 7A | 2002-11-01 | WYATT, ANGIE | |
| 02-52710 | 7N | 2002-11-01 | WHITE, JACQUELINE | |
| 02-52711 | 7N | 2002-11-01 | WILLIAMS, KAREN DENI | |
| 02-52712 | 7N | 2002-11-01 | WARREN, STACY L. | |
| 02-52713 | 7A | 2002-11-01 | WALLS, JEANETTE S. | |
| 02-52714 | 7N | 2002-11-01 | WILLIAMS, SHARON | |
| 02-52715 | 7N | 2002-11-01 | WASHINGTON, VICKIE R | |
| 02-52716 | 7N | 2002-11-01 | WHITNEY, JANET MARIE | |

```
04/01/03  15:47:41      Ch. 7 cases (Briggs - Dtr atty)      PAGE    3

Court Case Number      Curr.        Case      Debtor Name Ln1       Dtr
                       Case         Filed                           Atty
                       Chapt.       Date                            Code

02-52719               7A           2002-11-01  HILLS, ELAINE J.        2137
02-52720               7A           2002-11-01  TAYLOR, SYLVIA PATTO
02-52721               7N           2002-11-01  MENZIES, BOBBY J.
02-52722               7N           2002-11-01  STROZIER, TIFFENY
02-52723               7N           2002-11-01  STANCIEL, EARLENE
02-52724               7A           2002-11-01  LOGAN, VERNICA
02-52725               7N           2002-11-01  LACY, JESSIE
02-52726               7N           2002-11-01  ROGERS, RHOSHAY DIAR
02-52727               7N           2002-11-01  RATLIFF, BEULAH L.
02-52728               7A           2002-11-01  PHILLIPS, SHALA
02-52729               7N           2002-11-01  JACKSON, REGINA
02-52730               7N           2002-11-01  JOHNSON, VIOLA
02-52731               7N           2002-11-01  JACKSON, DIANA J.
02-52732               7N           2002-11-01  HARPER, RAMON
02-52733               7N           2002-11-01  HARRIS, DAMON LAMONT
02-52734               7N           2002-11-01  HURSE, MONIQUE S.
02-52735               7N           2002-11-01  HILL, LEON CHARLES
02-52736               7N           2002-11-01  CHANDLER, EMMA L.
02-52737               7N           2002-11-01  BROWN, DONNA JEAN
02-52738               7N           2002-11-01  BURSE, RAYMOND LEE
02-52739               7N           2002-11-01  BEAN, JERICAH
02-52740               7A           2002-11-01  FRENCHIE, DORIS J.
02-52741               7N           2002-11-01  BROWN, KATINA
02-52742               7N           2002-11-01  BIRKENMEIER, STUART
02-52743               7N           2002-11-01  FORD, SHEANEATHER
02-52744               7N           2002-11-01  NOWICKI, PENNIE MELE
02-52745               7N           2002-11-01  BROWN, JANNIE MAE
02-52746               7N           2002-11-01  BONNER, ANISHA L.
02-52747               7N           2002-11-01  EARLS, TANYA R.
02-52748               7N           2002-11-01  EDWARDS, TINA MARSHE
02-52749               7A           2002-11-01  PENNY, MICHAEL
02-52750               7N           2002-11-01  O'TOOLE, CLEMENTINE
02-52751               7N           2002-11-01  SMITH, ANGELEUE
02-52752               7N           2002-11-01  STUCKEY, CATHERINE
02-52753               7N           2002-11-01  WASHINGTON, SHANTEYA
02-52754               7N           2002-11-01  RODRIGUEZ, RUBEN  JR
02-52756               7N           2002-11-01  KNIGHT, CLAUDIA JEAN
02-52757               7N           2002-11-01  RUCKER-ROSS, TERRI
02-52758               7N           2002-11-01  OWENS, SHARILYNNE JE
02-52759               7N           2002-11-01  KELLY, LANA JEANETTE
02-52760               7N           2002-11-01  MCDANIELS, YAMICA M.
02-52761               7N           2002-11-01  MCCURRY, REGINA ANN
02-52762               7N           2002-11-01  LOGAN, DAVID
02-52763               7N           2002-11-01  JACKSON-JONES, DORIS
02-52764               7N           2002-11-01  JOHNSON, ROSA L.
02-52765               7N           2002-11-01  HALL, MARY L.
02-52766               7N           2002-11-01  HOLLIS, JOHNNY JOE
02-52767               7N           2002-11-01  WILLIAM, HOUSTON
02-52775               7N           2002-11-01  TODD, DIONNE ANTOINE
```

```
04/01/03  15:47:41       Ch. 7 cases (Briggs - Dtr atty)       PAGE    4

Court Case Number      Curr.        Case   Debtor Name Lnl        Dtr
                       Case         Filed                         Atty
                       Chapt.       Date                          Code

02-52776               7N      2002-11-01  TATUM, DENISE A.        2137
02-52777               7N      2002-11-01  FOREST, CANDRA DYONN
02-52778               7N      2002-11-01  MOORE, MARK EVERETT
02-52779               7N      2002-11-01  CRUES, BRIAN D.
02-52780               7N      2002-11-01  COX-OLIVER, RHONDA D
02-52784               7N      2002-11-01  LANG, VINCENT T.
02-52786               7N      2002-11-01  SAMPLE, LUVENIA
02-52787               7N      2002-11-01  MERRILL, KIMBERLY N.
02-52793               7N      2002-11-01  BRUMFIELD-LEVINE, KE
02-52916               7N      2002-11-05  ANDERSON, DARRYL WES
02-52917               7N      2002-11-05  ANDERSON, CAMESE M.
02-52919               7N      2002-11-05  THORNTON, NANCY MARY
02-52920               7N      2002-11-05  STAYTON, DELORES
02-52921               7N      2002-11-05  SMOOT, KIMBERLY A.
02-52922               7N      2002-11-05  SLAUGHTER, CARLISE
02-52923               7N      2002-11-05  JONES, ROBIN MARIE
02-52924               7N      2002-11-05  WOODSON, FLORA JAYNE
02-52925               7N      2002-11-05  WILLIAMS, ROSALIND
02-52926               7N      2002-11-05  WILLIAMS, PERKIETA K
02-52927               7N      2002-11-05  WILLIAMS, CHERYL A.
02-52928               7N      2002-11-05  WILKINS, ROSCOE
02-52929               7N      2002-11-05  WHITFIELD, TOWANDA
02-52930               7N      2002-11-05  WHITFIELD, CHARLES E
02-52931               7N      2002-11-05  DURANT, ROSCHELL D.
02-52932               7N      2002-11-05  ELLISON, MARY MARIE
02-52933               7N      2002-11-05  FOWLER, GINA
02-52934               7N      2002-11-05  GILLESPIE, RENDA
02-52935               7N      2002-11-05  HULSEY, MELISSA
02-52936               7N      2002-11-05  HURD, CASSANDRA Y.
02-52937               7N      2002-11-05  LESLIE, PATRICIA
02-52938               7N      2002-11-05  LITTLE, BETTY L.
02-52939               7N      2002-11-05  BOWMAN, PANACEA
02-52940               7N      2002-11-05  MCMILLER, LARRY   JR.
02-52941               7N      2002-11-05  MITCHELL, DEBORAH
02-52942               7N      2002-11-05  MOORE, ALEA
02-52943               7N      2002-11-05  MORGAN, HARRISON ALE
02-52944               7N      2002-11-05  MOSBY, ERICK
02-52945               7N      2002-11-05  OSBORNE, VERONICA RE
02-52946               7N      2002-11-05  PACK, SHAWNETTE D.
02-52947               7N      2002-11-05  JOHNSON, ALICIA RENE
02-52948               7N      2002-11-05  PALMER, TAHKELA ANN
02-52949               7N      2002-11-05  CARROLL, SHEILA
02-52950               7N      2002-11-05  BROWN, KATEENA
02-52951               7N      2002-11-05  CLARK, FRANCINE
02-52952               7N      2002-11-05  CARTER, WADE D. JR.
02-52953               7N      2002-11-05  COLEY, WAULETTA LYNN
02-52954               7N      2002-11-05  DEFRENNE, JOSEPH G.
02-52955               7N      2002-11-05  DOUGLAS, KIBYA D.
02-52956               7N      2002-11-05  PRIMUS, MARCIE
```

```
04/01/03  15:47:41      Ch. 7 cases (Briggs - Dtr atty)      PAGE    5

Court Case Number      Curr.        Case     Debtor Name Lnl       Dtr
                       Case         Filed                          Atty
                       Chapt.       Date                           Code

02-52957               7N       2002-11-05   THORTON, LORISE        2137
02-52958               7N       2002-11-05   BROOKS, SHIRLEY A.
02-52959               7N       2002-11-05   BROWN, CANDICE NANET
02-52960               7N       2002-11-05   BROWN, JAMES D.
02-52961               7N       2002-11-05   BROWN, MICHAEL ANTHO
02-52962               7N       2002-11-05   BUCHANAN, CRYSTAL A.
02-52963               7N       2002-11-05   BURNS, LAURA
02-52964               7N       2002-11-05   GARVIN, CONNIE D.
02-52965               7N       2002-11-05   GREEN, DENISE
02-52966               7N       2002-11-05   GATES, SHEIFON
02-52967               7N       2002-11-05   HAMER, GWENDOLYN K.
02-52968               7N       2002-11-05   MACK, SHERWANDA L.
02-52969               7N       2002-11-05   KEATON, PAMELA R.
02-52970               7N       2002-11-05   UPCHURCH, CELENA NIC
02-52971               7N       2002-11-05   WASHINGTON, AMMIE L.
02-53082               13       2002-11-06   DAVIS, JOYCE M.
02-53087               7N       2002-11-06   SANDERS, CHRISTINE .
02-53088               7N       2002-11-06   SHERMAN, JOYCE ANN
02-53089               7N       2002-11-06   SHAW, CYNTHIA
02-53090               7N       2002-11-06   SHUMPERT, NICOLE S.
02-53091               7N       2002-11-06   CASIMERE, ANTHONY ED
02-53092               7N       2002-11-06   SHEPARD, RAYMEL
02-53093               7N       2002-11-06   CAMPBELL, GLORIA GEN
02-53094               7N       2002-11-06   HOLLIS, RENEE M.  .
02-53095               7N       2002-11-06   SHERMAN, KIM T.
02-53096               7N       2002-11-06   SHELTON, DIANA
02-53097               7N       2002-11-06   SIMMONS, BRENDA JOYC
02-53098               7N       2002-11-06   MONROE, SHAWN D.
02-53099               7N       2002-11-06   MUHAMMAD, ISHMAEL
02-53100               7N       2002-11-06   ARMSTRONG, PEGGY
02-53101               7N       2002-11-06   SANDERS, LULA MAE
02-53102               7N       2002-11-06   SYDNOR, SERRITA D.
02-53103               7N       2002-11-06   CUMMINGS, CHARLES BA
02-53104               7N       2002-11-06   CROSS, CYNTHIA ANNE
02-53105               7N       2002-11-06   LEE, BRENDA
02-53106               7N       2002-11-06   DAUGHERTY, EARLENE B
02-53107               7N       2002-11-06   BURTON, MARIA ANTOIN
02-53108               7N       2002-11-06   BROWN, SHAKIMA C.
02-53109               7N       2002-11-06   DEAN, KAREN
02-53110               7N       2002-11-06   REECE, ANDREA
02-53111               7N       2002-11-06   BOWEN, JESTENE M.
02-53112               7N       2002-11-06   BAKER, LAWRENCE I.
02-53113               7N       2002-11-06   CARRAWELL-MOSELY, IR
02-53114               7N       2002-11-06   HEARNDON, GLORIA ELI
02-53115               7N       2002-11-06   STRONCE, GLORIA
02-53116               7N       2002-11-06   PATTON, LINDA
02-53117               7N       2002-11-06   SHARP, JAMES
02-53128               7A       2002-11-06   CLARK, PAMELA J.
02-53129               7N       2002-11-06   FROST, MARY HARRIS
```

```
04/01/03   15:47:41      Ch. 7 cases (Briggs - Dtr atty)      PAGE    6
```

| Court Case Number | Curr.<br>Case<br>Chapt. | Case<br>Filed<br>Date | Debtor Name Ln1 | Dtr<br>Atty<br>Code |
|---|---|---|---|---|
| 02-53130 | 7N | 2002-11-06 | SALLIS, HOWARD ALLEN | 2137 |
| 02-53131 | 7N | 2002-11-06 | SIMMONS, ROCHELLE DE | |
| 02-53132 | 7N | 2002-11-06 | SMITH, TERENCE K. | |
| 02-53133 | 7N | 2002-11-06 | CROSS, CARMEN | |
| 02-53134 | 7N | 2002-11-06 | SUGGS, DERRICK | |
| 02-53175 | 13 | 2002-11-07 | STEWARD, BILLY | |
| 02-53176 | 13 | 2002-11-07 | REDDIC, DONYA | |
| 02-53177 | 13 | 2002-11-07 | JONES, LELIA A. | |
| 02-53178 | 13 | 2002-11-07 | THADDIES, TAMMY R. | |
| 02-53246 | 7A | 2002-11-10 | DEES, ALFRED | |
| 02-53247 | 7N | 2002-11-10 | RAY, KEITH | |
| 02-53248 | 7N | 2002-11-10 | BICKLEY, LYSHAWNEDA | |
| 02-53249 | 7N | 2002-11-10 | SHIM, EUGENE L. | |
| 02-53250 | 7N | 2002-11-10 | PATTERSON, GREGORY | |
| 02-53251 | 7N | 2002-11-10 | SAMPSON, MARIA L. | |
| 02-53252 | 7N | 2002-11-10 | TORRENCE, JEANNETTE | |
| 02-53253 | 7N | 2002-11-10 | COHEN, WANDA | |
| 02-53254 | 7N | 2002-11-10 | JONES, VIRGIL LEE | |
| 02-53255 | 7N | 2002-11-10 | JACKSON, SANDRA | |
| 02-53256 | 7N | 2002-11-10 | RANSOM, KATHY | |
| 02-53257 | 7N | 2002-11-10 | PERKINS, CARLOS A | |
| 02-53258 | 7N | 2002-11-10 | ST. CLAIR, TAMISHA D | |
| 02-53259 | 7N | 2002-11-10 | WAGNER, HERMAN C. | |
| 02-53260 | 7N | 2002-11-10 | HOGAN, SHATARA C. | |
| 02-53261 | 7N | 2002-11-10 | WISE, BARBARA MARIA | |
| 02-53262 | 7N | 2002-11-10 | TURNER, ALEXANDER | |
| 02-53263 | 7N | 2002-11-10 | NEWTON, GRALIN | |
| 02-53264 | 7N | 2002-11-10 | BRINKER, LISA | |
| 02-53265 | 7N | 2002-11-10 | PARIS-JONES, LULA | |
| 02-53267 | 7N | 2002-11-10 | TOWNSELL, EBONEY CHR | |
| 02-53268 | 7N | 2002-11-10 | BOYKIN, LAWANDA NICO | |
| 02-53269 | 7N | 2002-11-10 | GEORGE-IRVING, ANNIE | |
| 02-53270 | 7N | 2002-11-10 | MILLS, DANA | |
| 02-53271 | 7N | 2002-11-10 | BILLUPS, ANTHONY JER | |
| 02-53272 | 7N | 2002-11-10 | TAYLOR, PATRICIA | |
| 02-53273 | 7N | 2002-11-10 | SHAUNTAY, MITCHELL | |
| 02-53274 | 7N | 2002-11-10 | HALL, PATRICIA A. | |
| 02-53275 | 7N | 2002-11-10 | ELLIS, JAMES W. | |
| 02-53276 | 7N | 2002-11-10 | BARNES, DUANE M. | |
| 02-53277 | 7N | 2002-11-10 | GULLEY, KAREN RENEE | |
| 02-53278 | 7N | 2002-11-10 | WEEKLY-LATHAM, HANNA | |
| 02-53279 | 7N | 2002-11-10 | BONNER, JEANMARIE | |
| 02-53280 | 7N | 2002-11-10 | BURSE, ETHEL L. | |
| 02-53281 | 7N | 2002-11-10 | CONEY, TAWANDA | |
| 02-53282 | 7N | 2002-11-10 | DECLUE, TIFFANY ERIN | |
| 02-53286 | 7N | 2002-11-10 | GAVIN, ELIZABETH J. | |
| 02-53287 | 7N | 2002-11-10 | BROWN, JAMES LATROY | |
| 02-53288 | 7N | 2002-11-10 | TAYLOR, BEULAH MAE | |
| 02-53289 | 7N | 2002-11-10 | LEWIS, KALESHA CAMIL | |

```
04/01/03  15:47:41        Ch. 7 cases (Briggs - Dtr atty)        PAGE    7

Court Case Number      Curr.        Case      Debtor Name Ln1        Dtr
                       Case         Filed                           Atty
                       Chapt.       Date                            Code

02-53290               7N      2002-11-10   COOKE, ANNETTE M.       2137
02-53291               7N      2002-11-10   GRIFFIN, FRANCES R.
02-53292               7N      2002-11-10   HARPER, LAKEISHA
02-53293               7N      2002-11-10   HARVEY, TONY ALONZO
02-53294               7N      2002-11-10   COOPER, JANET L.
02-53295               7N      2002-11-10   SAMPLE, WANDA M.
02-53296               7N      2002-11-10   TURNER, KALONDRA
02-53297               7N      2002-11-10   BORDEAUX, DEBRA ANN
02-53298               7N      2002-11-10   BENSON, MYRTLE JEAN
02-53299               7N      2002-11-10   SMITH, ANGELA R.
02-53300               7N      2002-11-10   ALEXANDER, LARISSA Y
02-53301               7N      2002-11-10   JACKSON, JERRI D.
02-53306               7N      2002-11-10   HENDERSON, RODNEY B
02-53307               7N      2002-11-10   RODGERS, STACEY RENE
02-53308               7N      2002-11-10   HUDSON, ROSE
02-53309               7N      2002-11-10   CLARK, PATRICIA
02-53323               7N      2002-11-10   HELLEMS-STEWART, KEN
02-53324               7N      2002-11-10   STOWE, JALANDA LEATR
02-53325               7N      2002-11-10   BONNETT, SHERRY
02-53326               7N      2002-11-10   SUTHERLIN, LEE CARL
02-53390               7N      2002-11-10   GADDY, VICTORIA MARI
02-53391               13      2002-11-12   BUNTING, BARBARA M.
02-53392               13      2002-11-12   MORRIS, CECILIA
02-53393               13      2002-11-12   FLETCHER, SHARITA R.
02-53425               7N      2002-11-12   CUNNINGHAM, CHARLENE
02-53427               7N      2002-11-12   RICHARDSON, PATRICE
02-53432               7N      2002-11-12   JOHNSON, DARREN K.
02-53433               7N      2002-11-12   EVANS, DARRELL L.
02-53434               7N      2002-11-12   FISHER, LASHEENA D.
02-53435               7N      2002-11-12   PORTER, ELESIA SHATO
02-20649               7N      2002-11-13   FARRAH, KRISTINA M.A
02-53416               7A      2002-11-13   PETTY-SMITH, AMANDA
02-53417               7A      2002-11-13   JONES, MAKEYTA
02-53418               7N      2002-11-13   BELL, JESSICA
02-53419               7N      2002-11-13   HICKMAN, MARK E.
02-53420               7N      2002-11-13   HOWARD, JAMES E.
02-53421               7A      2002-11-13   BANDERMAN, AMY S.
02-53422               7N      2002-11-13   LACKLAND, EYDIE T.
02-53423               7N      2002-11-13   WALLACE, CHERRY DENI
02-53424               7N      2002-11-13   AMERSON, CATINA M.
02-53426               7A      2002-11-13   ROGERS, JAMES E.
02-53428               7A      2002-11-13   DOSS, SHANTA
02-53429               7N      2002-11-13   COLLINS, LATASHA L.
02-53430               7N      2002-11-13   LUCKEY, DARRYN   SR.
02-53431               7N      2002-11-13   COLLINS, SHANNON K.
02-53437               7A      2002-11-13   SCRUGGS, MONICA ANN
02-53438               7A      2002-11-13   JOHNSON, WILLIE
02-53439               7N      2002-11-13   JOINER, KATINA
02-53440               7N      2002-11-13   MCCARTER, MARION L.
```

```
04/01/03   15:47:41        Ch. 7 cases (Briggs - Dtr atty)        PAGE     8

Court Case Number      Curr.          Case    Debtor Name Ln1         Dtr
                       Case           Filed                           Atty
                       Chapt.         Date                            Code

02-53477               13      2002-11-13  ALEXANDER, CORTLAND     2137
02-53505               7N      2002-11-13  HALL, CHANTA RENEE
02-53506               13      2002-11-13  PERRY, JANICE D.
02-53507               13      2002-11-13  MONDAINE, VANERIA
02-53509               7A      2002-11-13  HICKMAN, ANNIE LEE
02-53511               7N      2002-11-13  JOHNSON, ANJEANETTE
02-53512               7N      2002-11-13  BALLARD, YOLANDA REN
02-53513               7N      2002-11-13  WALKER, CARLA RENEE'
02-53514               7N      2002-11-13  MAULDIN, LISA ROCHEL
02-53487               7N      2002-11-14  ROBINSON, MAYOLA
02-53488               7N      2002-11-14  PARHAM, SANDRA
02-53489               7N      2002-11-14  ROGERS, PHYLLIS
02-53490               7N      2002-11-14  DUFF, RANDY K.
02-53491               7N      2002-11-14  FROST, GLORIA JEAN
02-53492               7N      2002-11-14  DAVIS, FRANK
02-53493               7A      2002-11-14  GRIFFIN, MICHELLE Y.
02-53494               7A      2002-11-14  WALKER, CARLA RENEE
02-53495               7N      2002-11-14  DAY, WILLIE F.
02-53496               7N      2002-11-14  HODGE, HARLAN
02-53497               7N      2002-11-14  WILSON, AMOS
02-53498               7N      2002-11-14  THOMPSON, RITA FAYE
02-53499               7N      2002-11-14  TUFTS, MARIA ROBIN
02-53500               7N      2002-11-14  WOODARD, OTIS LE'AND
02-53501               7N      2002-11-14  BELK, RUSSELL KEITH
02-53502               7N      2002-11-14  ISAAC, BOBBY CURTIS
02-53503               7N      2002-11-14  PATTERSON, EUNICE
02-53508               13      2002-11-14  BOYD, CINDY
02-53510               7N      2002-11-14  TRICE, STANLEY
02-53524               7N      2002-11-14  HOLMES, MONICA L.
02-53525               7N      2002-11-14  PRINCE, CHERYLE
02-53526               7N      2002-11-14  WILSON, PATRICIA A.
02-53527               7N      2002-11-14  CARTER, IDA J.
02-53528               7N      2002-11-14  FIELDS, JOYCE
02-53529               7N      2002-11-14  HICKMAN, ANNIE LEE
02-53530               7N      2002-11-14  HUGHES, FRANCES B.
02-53531               7N      2002-11-14  DENNIS, ORA
02-53532               7A      2002-11-14  JOHNSON, NANCY PATRI
02-53533               7N      2002-11-14  TAYLOR, ROOSEVELT
02-53534               7N      2002-11-14  MOORE, CELESTINE P.
02-53535               7N      2002-11-14  VAULTZ, RAYMOND F.
02-53536               7N      2002-11-14  HARRISON, MICHELLE A
02-53537               7N      2002-11-14  ROGERS, CAMELIA
02-53538               7N      2002-11-14  THOMPSON, TYRAL ANN
02-53539               7N      2002-11-14  GUIDO, ELSEA  JR.
02-53540               7N      2002-11-14  COTHRINE, ANA MALIA
02-53541               7N      2002-11-14  RUSSELL, LISA RENEE
02-53542               7N      2002-11-14  MCELROY, MARILYN J.
02-53543               7N      2002-11-14  BELTON, KAREN R.
02-53544               7N      2002-11-14  TALTON, ANTHONY
```

```
04/01/03  15:47:41        Ch. 7 cases (Briggs - Dtr atty)      PAGE    9

Court Case Number      Curr.          Case    Debtor Name Lnl        Dtr
                       Case           Filed                          Atty
                       Chapt.         Date                           Code

02-53545               7N        2002-11-14  IKPEAMA, KELECHI        2137
02-53546               7N        2002-11-14  PARGO, BRANDY
02-53547               7N        2002-11-14  GLOVER, ANISA MARIE
02-53548               7N        2002-11-14  NELSON, DENISE N.
02-53549               7N        2002-11-14  HARMON, KAREN MICHEL
02-53550               7N        2002-11-14  GRIFFIN, MICHELLE Y.
02-53551               7N        2002-11-14  JOHNSON, ROSETTA A.
02-53552               7N        2002-11-14  WATSON, DWIGHT MAURI
02-53571               7N        2002-11-14  BELL, CHARLOTTE
02-53572               7N        2002-11-14  INGRAM, TIFANEE R.
02-53573               7N        2002-11-14  TERRY, JANICE
02-53574               7N        2002-11-14  JOHNSON, JOYCE A.
02-53575               7N        2002-11-14  THOMPSON, DEBORAH E.
02-53576               7N        2002-11-14  CAGE, SANDRA M.
02-53577               7N        2002-11-14  JOHNSON, ANNETTE
02-53578               7N        2002-11-14  NASH, QUINCY ANTON
02-53579               7N        2002-11-14  GIBBS, MICHELLE D.
02-53580               7N        2002-11-14  PRATER, BRIDGETT
02-53581               7N        2002-11-14  STOCKTON, JOYCE
02-53582               7N        2002-11-14  BAILEY, ERIC
02-53583               7N        2002-11-14  MIKELL, RUBY J.
02-53584               7N        2002-11-14  TAYLOR, GARLAND
02-53585               7N        2002-11-14  SCOTT, PATRINA
02-53586               7N        2002-11-14  BUTLER, RUTH
02-53587               7N        2002-11-14  SILVEREST, THRESA AN
02-53588               7N        2002-11-14  BROWN, ERIC
02-53589               7N        2002-11-14  RICHARDSON, MARY VAL
02-53590               7N        2002-11-14  YATES, ROY  JR.
02-53591               7N        2002-11-14  DANFORT, NEEKIA F.
02-53592               7N        2002-11-14  CUMMINGS, VICKEY LYN
02-53596               7N        2002-11-14  JOYNER, FAYE
02-53597               7N        2002-11-14  GATES, SHARON A.
02-53598               7N        2002-11-14  GREEN, VERONICA
02-53599               7N        2002-11-14  SIMMS, SHANEL ELAINE
02-53600               7N        2002-11-14  WALKER, SHAWNTAE
02-53601               7N        2002-11-14  MEEKS, TONY
02-53602               7N        2002-11-14  WHITTIER, TERRENCE
02-53604               7N        2002-11-14  GARNER, DENISE
02-53605               7N        2002-11-14  KIRKSEY, YOLANDA
02-53606               7N        2002-11-14  LIDDELL, WARREN LEE
02-53607               7N        2002-11-14  ADAMS, ANNETTE
02-53608               7N        2002-11-14  HARRIS, DANA R.
02-53609               7N        2002-11-14  JOHNSON-KING, LYNETT
02-53610               7N        2002-11-14  SYKES, DEBORAH A.
02-53636               13        2002-11-14  MCDONALD, NAKEITA

* * *  E N D  O F  R E P O R T  * * *
```

52658 Beauregard
52740 Frenchie
52767 William
52778 Moore
52918 King
52956 Primus
53094 Hollis
53105 Lee
53107 Burton
53247 Ray
53249 Shim
53252 Torrence
53253 Cohen
53255 Jackson
53256 Ransom
53272 Taylor
53276 Barnes
53281 Coney
53291 Griffin
53322 Dees
53323 Hellems-Stewart
53325 Bonnett
53326 Sutherlin
53419 Hickman
53496 Hodge
53499 Tufts
53509 Hickman
53510 Trice
53511 Johnson
53512 Ballard
53513 Walker
53532 Johnson, N
53534 Moore, C
53535 Vaultz
53540 Cothrine
53546 Pargo
53550 Griffin
53576 Cage
53585 Scott
53586 Butler
53587 Silverest
53590 Yates
53591 Danfort
53592 Cummings
53596 Joyner
53598 Green
53599 Simms
53601 Meeks
53603 Williams, J
53605 Kirksey
53607 Adams
53610 Sykes


EXHIBIT

# ATTACHMENT  C

UNITED STATED BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No. 02-53575-172 |
| | ) | Adversary No. 03-4003-172 |
| Deborah E. Thompson | ) | Chapter 7 |
|     Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| C.E. "Sketch" Rendlen III | ) | Honorable James J. Barta |
| United States Trustee, | ) | U.S. Bankruptcy Judge |
| Eastern District of Missouri | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| Ms. Beverly Holmes | ) | |
| d/b/a Critique Services | ) | |
| d/b/a Critique Legal Services | ) | |
| and Critique Legal Services, L.L.C. | ) | |
|     Defendants | | |

PERMANENT INJUNCTION AND CONSENT DECREE

At St. Louis, in this District, this 29TH of $December$ 2003.

The United States Trustee, Plaintiff, by his Attorney, Martha M. Dahm, and Defendants,

Beverly Holmes, d/b/a Critique Services, d/b/a Critique Legal Services and Critique Legal

Services, L.L.C. , by their attorney Leonard Komen, agree to the entry of the following

Permanent Injunction and Consent Decree:

IT IS HEREBY ORDERED that the Defendants Beverly Holmes, d/b/a Critique Services,

d/b/a Critique Legal Services, and Critique Legal Services, L.L.C., (hereinafter referred to as

"Defendants") shall comply with the Consent Permanent Injunction and Court Order dated

1

March 9, 1999, entered in the Adversary Proceeding No. 99-4065, Joel Pelofsky v. Beverly

Holmes, d/b/a Critique Service, Case No. 99-40898-172, In Re Daniele M. Hamilton, and with

the Consent Permanent Injunction and Court Order dated November 20, 2001, entered in the

Adversary Proceeding No. 01-4333, Joel Pelofsky v. Beverly Holmes, d/b/a Critique Service,

Case No. 00-48404-293, In Re Beatrice Bass.   These Orders shall remain in full force and effect

against Defendant Beverly Holmes, d/b/a Critique Services, d/b/a Critique Legal Services and

shall be enforceable against Defendant Critique Legal Services, LLC.

 IT IS FURTHER ORDERED that Defendants are permanently  barred from being a

bankruptcy petition preparer in this District.

 IT IS FURTHER ORDERED that Defendants are barred from being a bankruptcy petition

preparer in any other District within the United States for a period to two years from the entry of

this order.

 IT IS FURTHER ORDERED that this bar includes the following as defined in 11 U.S.C.

Section 110:

(A) Engaging in or advising debtors as to the preparation or filing of bankruptcy documents.

(B) Defendants Beverly Holmes and other non-lawyer assistants under their control or

supervision may not accept monies in their name from individuals seeking bankruptcy relief or

financial advice.

(C)  Defendants nor any entity controlled by Defendants shall not receive any monies in

Defendants' name from individuals for  bankruptcy services or preparation of bankruptcy

documents.

(D) Defendants shall not use the word "legal" or any similar term in any advertisements, or

2

advertise under any category that includes the word "legal" or any similar term.

(E) Defendants may not solicit financial or personal information from debtors to enable Defendants or others at under Defendants direction to insert information into bankruptcy documents to be filed.

(F) Defendants can not determine or recommend to debtors when or in which District to file bankruptcy documents.

(G) Defendants can not advise debtors of the consequences regarding the filing of a bankruptcy petition under Title 11 of the United States Code.

(H) Defendants can not assist or advise debtors in connection with the preparation of bankruptcy documents as to:

(1) The classification of debt;

(2) The meaning of legal terms;

(3) The nature of available exemptions and the applicability of an exemption to an individual's circumstances;

(4) Any issues pertaining to the ability or inability to discharge debt;

(5) Any issues pertaining to the automatic stay provisions of the Bankruptcy Code;

(6) The correction of errors or omissions on bankruptcy form drafts submitted to Defendants for bankruptcy form preparation other than as directed by debtors;

(7) Any issues pertaining to the retention of assets by debtors on filing bankruptcy;

(8) Any issues pertaining to reaffirmations or redemptions;

(9) Any issues pertaining to lien avoidance under Section 522(f);

3

(10) Any issues regarding what action should be taken if an adversary action is filed against a debtor.

(I) Defendants and others under Defendants control shall not explain any issues to debtors arising from the use of a questionnaire form.

(J) Notwithstanding the foregoing Defendants and others under Defendants control shall be authorized but limited to typing or transcribing written information provided to them from the debtors at the direction of the supervising attorney in the office at Critique Services.

IT IS FURTHER ORDERED that Defendants consent to the United States Trustee's Office right to select at random  clients from Critique Services and speak with them about debtors bankruptcy services provided to them from Critique Services.

IT IS FURTHER ORDERED that the United States Trustee's Motion for Rule to Show Cause against Beverly Holmes filed in In Re Cicely Wayne, Case No. 02-47990-172, shall be denied as moot upon proof of payment by Beverly Holmes that she paid the debtor $99.00, and such others as agreed by Defendants.  Proof of this payment shall be provided to the United States Trustee's Office within ten (10) days from the entry of this order.

4

IT IS FURTHER ORDERED that United States Trustee's Office has the right to request the appropriate relief in this matter if Defendants fail to abide by the terms of this Order and this settlement will be deemed as void and unenforceable.

__/s/Leonard Komen_____          Date: 12.11.03
Leonard Komen
7733 Forsyth Blvd., Ste. 300
Clayton, MO 63105

__/s/ Beverly Holmes_____          Date: 12.11.03
Beverly Holmes
Critique Services
4144 Lindell St. Suite 100
St. Louis, MO 63108

___/s/ Martha Dahm_____          Date: 12.18.03
Martha Dahm
Trial Attorney for the United States Trustee
111 South 10th St., Suite 6353
St. Louis, MO 63102

Date: _12-29-03_                    So Ordered: _James J. Barta_
                                    James J. Barta
                                    Bankruptcy Judge

5

# ATTACHMENT  D

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | | |
|---|---|---|
| In re: | ) | |
|    Hardge, David, | ) | Case No. 05-43244-659 |
| | ) | |
|        Debtor. | ) | Chapter 7 |
| | ) | |
| NANCY J. GARGULA | ) | Judge Kathy A. Surratt-States |
| UNITED STATES TRUSTEE, | ) | |
|        Plaintiff, | ) | Adversary No.05-04254-659 |
| | ) | |
|    v. | ) | |
| | ) | |
| BEVERLY HOLMES DILTZ, | ) | **SETTLEMENT AGREEMENT** |
| Individually and as a Member of | ) | **AND COURT ORDER** |
| Critique Services L.LC., | ) | |
| d.b.a Critique Services, | ) | |
|        Defendant, | ) | |
| | ) | |
|   and | ) | |
| | ) | |
| CRITIQUE SERVICES, L.L.C., | ) | |
| a Missouri Limited Liability Company, | ) | |
| d/b/a Critique Services, | ) | |
|        Defendant, | ) | |
| | ) | |
|   and | ) | |
| | ) | |
| RENEE MAYWEATHER, | ) | |
|        Defendant. | ) | |

**SETTLEMENT AGREEMENT AND COURT ORDER**

COMES NOW the United States Trustee for Region 13, Nancy J. Gargula, by her

attorney, Peter Lumaghi, and the Defendants Beverly Holmes Diltz, Critique Services, L.L.C.

and Renee Mayweather, by their counsel, Laurence D. Mass, Esq. and agree by their signatures

hereto to the following terms in full settlement of the allegations set out in the complaint filed by

the United States Trustee in this adversary action and to the entry of this Settlement Agreement

1

and Court Order by the Court.

## SETTLEMENT AGREEMENT

1. Defendant Diltz, on behalf of herself, any entity, or person which she now or in the future controls, including but not limited to Critique Services, LLC d/b/a Critique Services (hereafter collectively referred to as "Defendant Diltz and Her Interests"), agree that they shall remain in compliance with and subject to any and all bankruptcy court orders entered against them, and that in the event of a conflict with the terms of this Settlement Agreement and Court Order and any prior order issued by a Court, the terms and provisions of the present Court Order shall control.

2. Defendant Diltz and Her Interests agree that she will not directly or indirectly through others meet with bankruptcy prospective clients/clients or create bankruptcy documents for consideration other than to file a bankruptcy petition for herself or for the bankruptcy case of any of Her Interests.

3. Defendant Diltz and Her Interests agree that the only services they shall provide to any attorney or business organization whose primary business is the practice of law in connection with bankruptcy case preparation are:

    A.     Office facilities and equipment;

    B.     Advertising and marketing;

    C.     Equipment and software training to the attorney, attorney's employees or the attorneys and employees of the business organization whose primary business is the practice of law;

    D.     License of use of the proprietary name, trade and service mark "Critique Services";

    E.     Software. Bankruptcy document preparation software shall be licensed

2

from a nationally recognized software provider;

F.      Telephone number; and

G.      Bookkeeping related to payroll, receivables, payables and required

government forms, excepting bankruptcy-related documents.

4. Defendant Diltz and Her Interests agree that neither she nor any employee or

contractor under her or Her Interests shall provide bankruptcy document preparation services to

the general public.

5. Defendant Diltz and Her Interests agree that any business relationship with an attorney

or business organization whose primary business is the practice of law shall only be by and

pursuant to a written contract or license whose terms shall state, at a minimum, the following:

A.      Defendant Diltz and Her Interests shall not provide any bankruptcy

document preparation services directly or through others to the general

public;

B.      The attorney or business organization whose primary business is the

practice of law business agrees that he/she will meet with all prospective

bankruptcy clients before any non-attorney meets with a prospective

bankruptcy client to discuss the prospective's financial and personal

history and suitability for filing a bankruptcy case under a particular

chapter of the United States Bankruptcy Code;

C.      The attorney agrees to preserve all notes and records relating to each

attorney-prospective client/client meeting as well as memorialize the date

of each meeting;

D.      The attorney or business organization whose primary business is the

practice of law agrees to have each prospective client/client sign and date

3

an attorney meeting form for each attorney-prospective client/client

meeting, a copy of which shall be given to the prospective client/client.

These documents shall be retained by the attorney or business

organization whose primary business is the practice of law and continue to

be protected by any applicable attorney-client privilege;

E.     The attorney or business organization whose primary business is the

practice of law agrees that no prospective client/client will be permitted to

sign any bankruptcy petition created for the purpose of being filed with

any United States Bankruptcy Court unless and until the prospective

client/client has personally reviewed for accuracy that document with the

attorney;

F.     The attorney or business organization whose primary business is the

practice of law agrees to keep all bankruptcy documents which contain an

original signature of each prospective client/client in accordance with

applicable Bankruptcy Court Rules or Orders;

G.     Defendant Diltz and Her Interests agree to make and preserve a record of

the date, attendees and subject matter of each training session provided to

the employees of an attorney or business organization whose primary

business is the practice of law;

H.     Defendant Diltz and Her Interests agree to accept payment of monies

under the agreement or license with an attorney or business organization

whose primary business is the practice of law only from the attorney or

business organization  and only upon presenting the attorney or business

organization whose primary business is the practice of law  with a billing

4

statement setting forth the particular service provided under the permissible services set out above.  Defendant Diltz and the attorney or business organization whose primary business is the practice of law  shall each agree to preserve and maintain these billing and payment records for a period of seven years from the date of the creation of the record;

I.      The attorney or business organization whose primary business is the practice of law agree to preserve and maintain all records of all communications with a bankruptcy client, which records must state the date and substance of the communication.  Such records will be made available to the U.S. Trustee upon request and the written waiver by the client of any applicable attorney-client privilege;

J.      Defendant Diltz and Her Interests agree that Defendant Diltz shall not request nor accept on behalf of herself or any of Her Interests any attorney password to access any United States Bankruptcy Court's electronic document filing system for filing bankruptcy documents;

K.      The attorney or business organization whose primary business is the practice of law agrees to file a bankruptcy petition for each client no later than fourteen days after the client signs the petition, unless the delay in filing after the fourteen day period is for the benefit of the client.  But in no case shall the attorney or business organization whose primary business is the practice of law file a bankruptcy petition more than thirty days after the client has signed the petition; and

L.      Defendant Diltz and Her Interests agree that a true copy of an agreement entered into pursuant to this Settlement Agreement by Defendant Diltz

5

and/or one or more of Her Interests with an attorney or business organization whose primary business is the practice of law shall be provided to the U.S. Trustee within ten (10) days of the date of a written request of the U.S. Trustee.

6. Defendant Mayweather agrees that she is permanently enjoined from the unauthorized practice of law and law business in and from the State of Missouri. She agrees that she may only engage in providing bankruptcy services to the public as an employee under written contract with an attorney or business organization whose primary business is the practice of law. She agrees that she is permanently enjoined from engaging in bankruptcy document preparation services on behalf of Defendant Diltz and Her Interests.

7. Defendants Diltz and Critique Services, LLC shall refund all fees paid for legal services by those bankruptcy clients deposed by the U.S. Trustee in the present litigation within one month from the date of the entry of this Settlement Agreement and Court Order by the Court. Said Defendants shall make out checks payable to the order of each of the clients so deposed by the U.S. Trustee and forward the checks to the U.S. Trustee for distribution.

8. Defendants Diltz and Critique Services, L.L.C. shall pay Ms. E. Rebecca Case, Esq. as compensation for her time and services in assisting the U.S. Trustee to prepare for trial the sum of $1,200.00 to be paid in six monthly payments of $200.00 each beginning the first day of the month following the date of entry of this Settlement Agreement and Court Order by the Court (see Exhibit A attached hereto).

9. Defendants Diltz and Critique Services, L.L.C. shall reimburse the U.S. Trustee for the cost of taking depositions of Critique Services' clients in preparation for this litigation the sum of $2,015.00 in twelve equal installments of $167.92 each, beginning thirty days from the date this Settlement Agreement and Court Order becomes final. (see Exhibit B attached hereto).

6

10. Upon a finding that any Defendant has violated the terms of this Settlement Agreement and Consent Decree, the Court retains jurisdiction to enter an Order assessing penalties to punish each such violation found to have occurred.

Agreed to on this the 27th of July, 2007 by the signatures of the parties as set out below:

UNITED STATES TRUSTEE
NANCY J. GARGULA

  /s/ Peter Lumaghi                 
PETER LUMAGHI MO24160/FED14577
111 S. 10th St., Ste. 6.353
St. Louis, Missouri 63102
tel. 314 539-2952
fax 314 512-2990
email peter.lumaghi@usdoj.gov

  /s/ Beverly Holmes Diltz            
DEFENDANT BEVERLY HOLMES DILTZ

  /s/ Beverly Holmes Diltz            
BEVERLY HOLMES DILTZ as sole member of
OF DEFENDANT CRITIQUE SERVICES L.L.C.

  /s/ Renee Mayweather             
DEFENDANT RENEE MAYWEATHER

  /s/ Laurence D. Mass, Esq.          
 LAURENCE D. MASS, ESQ.
Attorney for Defendants Beverly Holmes Diltz,
Critique Services, L.L.C., and Renee Mayweather.

7

## <u>COURT ORDER</u>

The United States Trustee, Nancy J. Gargula, by her attorney, Peter Lumaghi, and the

Defendants, Beverly Holmes Diltz, Critique Services L.L.C., and Renee Mayweather, by their

attorney, Laurence D. Mass, Esq., having agreed by their signatures above to the terms of the

Settlement Agreement as set out herein in full settlement of the Complaint filed in this Adversary

and. the Court, being full advised in the premises,

ORDERS that the Settlement Agreement as set out herein is **APPROVED,** and

the Defendants are hereby **ORDERED** to comply with paragraphs 1 through 9 of the Settlement

Agreement, violation of which may subject a Defendant or Defendants to the imposition of

sanctions by this Court.

*Kathy A. Surratt – States*
_____
KATHY A. SURRATT-STATES
United States Bankruptcy Judge

DATED:  July 31, 2007
St. Louis, Missouri
JJH

## EXHIBIT A

July 23, 2007

Office of the United States Trustee                                      Inv. #
86549

Complaint for Injunction, Sanctions and
Disgorgement


   Date Atty                                    Description
                                           Hours

02/06/07 ERC Reviewed fax from Peter Lumaghi; Email to Susan
               0.90 Strube to pull filesfrom storage; Reviewed U.S. Trustee
               complaint against Beverly Holmes and
               Renee Mayweather; Preparation for meeting with
               Peter Lumaghi and for trial(.9)

02/07/07 ERC Reviewed 15 filesin preparation for meeting with 1.30 Peter
               Lumaghi (1.3)

02/08/07 ERC Conference with Peter Lumaghi; Susan Strube to
               2.70 print allSchedules and Statements not from Pacer but
               from CD's with E. R. Case's recorded notes made at the Meeting
               of Creditors; Reviewed 15 files;Identified when each Debtor
               paid Critique, when each Debtor signed the Schedules and
               Statements, when the attorney signed the 2016, and when the
               case was filed;Shortest delay was two months and ten days;
               Longest delay was a year; Majority were not filedfor over six
               months from date payment was received; Identifiedother
               problems with allof the cases: Schedule A - incomplete;
               Schedule B - incomplete or inaccurate - each Debtor had $1.00
               or $10.00 no cash; No Debtor had a lifeinsurance policy of any
               kind; Schedules D, E and F incomplete or inaccurate; No
               Debtor had a co-Debtor or a lease of any kind; Debtor
               listedcharitable deductions on Schedule J but no giftson the
               Statement of Financial Affairs;Debtors allowed to filewithout
               critique determining iffederal and state income taxes owed were
               dischargeable (2.7)

05/07/07 ERC Reviewed email from Peter Lumaghi regarding trial
               0.20 was continued over the United States Trustee's


07/23/2007 10:43FAX 3147218660                    STONE LEYTON
                                      0 003/004

Page 2
July 23, 2007
Officeof the United States Trustee Inv.# 86549

| Date <u>Attar</u> | <u>Description</u> |
| | <u>Hours</u> |

Objections to August 1-3, 2007; IsE. R. Case available? Mr. Mass may want to depose E. R. Case (.1); Responded; E. R. Case is available for the trialon August 1-3, 2007 and is availableto be deposed (.1)

06/07/07 ERC Conference with Peter Lumaghi regarding trial
0.30 preparation (.3)

07/13/07 ERC Conference with Peter Lumaghi and Leonora Long re
0.50 facts of the case and issues of the case (.5)

### Professional Fees

E. Rebecca Case          5,90 hr Q 260.00 $ 1534,00


Total Professional Fees
$ 1,534.00


TOTAL NEW CHARGES                                              $ 1,534.00


### Summary of Account

| | | |
|---|---|---|
| Balance Forward | $ | 0.00 |
| Total New Charges | | 1,534.00 |
| Payments and Credits | | 0.00 |

TOTAL BALANCE DUE          $ 1,534.00


PLEASE MAKE YOUR CHECK PAYABLE TO
STONE, LEYTON & GERSHMAN

10

07/23/2007 10:43FAX 3147218660                    STONE LEPTON
                                                  Z004/004

Page 3
July 23, 2007
Office of the United States Trustee Inv.# 86549


PAYMENT DUE ON RECEIPT

11

**EXHIBIT B**

**U.S. TRUSTEE'S COSTS FOR DEPOSTIONS
OF CRITIQUE SERVICES' CLIENTS**

| NAME | DATE OF DEPOSITION | COST |
|------|-------------------|------|
| 1. Sheila Shortridge-Vaughn | May 12, 2006 | |
| 2. Kellie Shelton | May 12, 2006 | |
| 3. Toriandre Jenkins | May 12, 2006 | |
| 4. LaTonya McCullough | May 12, 2006 | Subtotal: $975.00 |
| 5. Tanis Jones | June 9, 2006 | |
| 6. Denise Quinn | June 9, 2006 | |
| 7. Gwendolyn King | June 9, 2006 | |
| 8. Shirley Damon | June 9, 2006 | |
| 9. Tawana Priestly | June 9, 2006 | Subtotal: $1,040.00 |
| | | Total: $2,015.00 |

Copies to:

Ms.Beverly Holmes Diltz
4009 Westminster Place
St. Louis, Missouri 63108

Ms. Renee Mayweather
2025 North 46th St.
East St. Louis, Illinois 62204

Mr. Laurence D. Mass, Esq.
230 S. Brentwood Blvd., Ste 1200
St. Louis, Missouri 63105

# ATTACHMENT  E

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement is entered into as of the 1st day of April, 2014, by and between the Parties, Latoya Steward (the "Plaintiff"), plaintiff in the adversary proceeding entitled *Steward vs. Critique services, LLC, et. al*, pending in the United States Bankruptcy Court for the Eastern District of Missouri as adversary proceeding number 13-4284 and movant in a contested matter titled Motion for Disgorgement of Attorney Fees and Other Equitable and Punitive Relief Based on Inadequate Representation by Debtor's Counsel in the underlying bankruptcy case (Case No. 11-46399-705 at docket entry number 29) (taken together the "Litigation") and Critique Services LLC, James Robinson, Ross Briggs, Beverly Diltz, Renee Mayweather, and Doreatha Jefferson, aka Derotha Conners, Defendants (the "Defendants") in the Litigation, on the following terms and conditions:

## RECITALS

A.      From 2009 to 2011 Plaintiff sought and received advice concerning obtaining protection and relief under Title 11.

B.      At that time, Debtor owed a secured debt to Ford Motor Credit.

C.      On June 17, 2011, Plaintiff filed for bankruptcy protection in the Eastern District of Missouri.

D.      Plaintiff signed a reaffirmation agreement with Ford Motor Credit.

E.      Plaintiff subsequently defaulted on the reaffirmed debt prior to the expiration of the deadline to rescind the agreement.

F.      Plaintiff attempted to rescind the reaffirmation agreement with Ford Motor Credit but this was done beyond the statutory deadline.  As such Plaintiff has been garnished and still personally owes a debt to Ford Motor Credit.

G.      Plaintiff has alleged that the Defendants harmed her by failing to assist her with the rescission of the reaffirmation agreement.

H.      Defendants deny any liability regarding the rescission.

I.      To avoid the expense, delay, uncertainty, and risk inherent in litigation concerning the issue of rescission, the Parties have concluded that it is appropriate and have agreed, after arms-length negotiations, to resolve this issue through this Release and Settlement Agreement.

J.      The Parties agree that it is in their shared self-interest to include claims that are not related to the aforementioned rescission in this Release, and therefore any and all claims and issues that may exist between them, with regard to any actions or inactions of the Parties, whether alleged or un-alleged in the Litigation, and any other acts occurring up to the date of the execution of this Release and Settlement Agreement.

K.      The Defendants insist, and the Plaintiff accepts, that the monetary portion of this settlement exclusively concerns the post-petition issue of rescission and not a payment toward any other claims.  This designation shall not be deemed to limit the scope of the Mutual Release, which shall govern all claims between the parties.

L.      The Parties agree that this Release and Settlement Agreement represents the conclusion of the cases and controversies between them.

NOW, THEREFORE, for good and valuable consideration between the parties, including the payments and undertakings recited herein, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

2

1.    Settlement Payment.  In consideration of the settlement provided herein and the Plaintiff's performance of her obligations under this Release and Settlement Agreement, and with no admission of liability or wrongdoing, and in satisfaction of their obligations hereunder and with no further obligations to the Parties not expressly provided for in this agreement, Defendants shall pay $27,500.00, via certified check, to Plaintiff, in care of The Law Offices of Mueller and Haller, LLC within ten business days of the approval of this Release and Settlement Agreement by the Court (the "Payment Date").  The Law Offices of Mueller and Haller, LLC shall hold the funds in trust until dismissal of the adversary proceeding and contested motion at which time the funds will be disbursed immediately to the Plaintiff.

2.    Mutual Releases.  Effective as of the Payment Date referenced in paragraph 1, the Parties, their respective heirs, agents, employees, executors, attorneys, administrators, successors and assigns do hereby release one another from any and all claims, regardless of whether such claims arose pre-petition or post-petition, demands, liens, contracts, covenants, actions, suits, causes of action, obligations, controversies, debts, costs, expenses, fees, damages, judgments, orders and liabilities of whatever kind or nature, in law, equity or otherwise, whether now known or unknown, vested or contingent, which exist or may exist in the future, arising from or related to the Litigation, any allegations that the Plaintiff pled or could have pled in any pleading they filed in the Litigation or otherwise raised in the Litigation, and that occurred up to and including the date of the parties' execution of this Release and Settlement Agreement.

3.    Effective Date of Release and Settlement.  This Release and Settlement Agreement, including, without limitation, the Mutual Releases set forth herein, shall become final and effective upon Court approval as further referenced in paragraph 4 of this Release and Settlement Agreement.

3

4.   <u>Court Approval</u>.   This Release and Settlement Agreement shall be conditioned upon and subject to approval from the Bankruptcy Court in both cases 11-46399 and 13-04284 currently pending in the Eastern District of Missouri. Plaintiff shall file a motion seeking court approval of this Release and Settlement which will not be opposed by the named Defendants.

5.   <u>Entire Release and Settlement</u>.  This Release and Settlement Agreement contains the entire release and settlement of the parties with respect to these matters (and solely with respect to these matters) and may not be modified in any way except in writing executed by the authorized representatives of each of the Parties hereto and approved by the Court.

6.   <u>Authorization</u>.   The individual signatories to this Release and Settlement Agreement represent that they have been duly authorized to execute this Release and Settlement Agreement on behalf of the parties they purport to represent herein.

7.   <u>Dismissal of Civil Actions</u>. The Plaintiff represents and warrants that she will cause to be filed with the bankruptcy court a stipulation to dismiss and proposed order of dismissal in the Litigation, (both the adversary and the pending motion) with prejudice and with each party bearing its own fees and costs, within three (3) business days after the Payment Date, and will provide immediate notice of such filing to Defendants by email service of same to Mr. Elbert Walton and Mr. Ross Briggs and regular notice to other parties are required by law.

8.   <u>Confidentiality.</u>  In consideration of the settlement provided herein and Parties' performance of their obligations under this Release and Settlement Agreement, the Parties expressly agree to maintain all the terms of this Release and Settlement Agreement, and the Parties' performance of their obligations hereunder, as confidential.  The Parties shall not voluntarily make any disclosures regarding the facts surrounding bankruptcy cases 11-46399 or

4

13-49620 to the media, any state or federal agency or court except to seek relief as provided at paragraph 17 below, unless written consent for such disclosure is obtained from the named Parties. This confidentiality provision shall not apply if one the Parties breach any of their obligations herein and this agreement is brought before the United States Bankruptcy Court for the Eastern District of Missouri in an action to enforce the terms or should the Plaintiff be arrested, summoned before a grand jury, indicted, or become the subject of a formal criminal information. This confidentiality provision shall not apply if the Plaintiff is named as a defendant in any judicial proceeding where an employee or former employee of any of the Defendants is a plaintiff. This provision shall be subject to paragraph 9 of this Release and Settlement Agreement. The Parties shall not authorize their attorneys to make any disclosures pursuant to Missouri Supreme Court Rule 4-1.6 regarding the facts surrounding bankruptcy cases 11-46399 or 13-49620 and any such disclosure shall constitute a breach of this Release and Settlement Agreement by the Party who was represented by the attorney.

9. <u>Settlement under Seal</u>. The Plaintiff shall file a Motion to Submit Release and Settlement Agreement for Court Approval under Seal with the Court.

10. <u>Third Party Rights</u>. None of the provisions of this Release and Settlement Agreement shall affect the Chapter 7 Trustee, Chapter 7 Estate, the United States Trustee, the United States Bankruptcy Court or the United States District Court. In particular, the Parties acknowledge that the sanctions order, dated November 13, 2013, entered on the contested motion against or on behalf of only some but not all parties to this Settlement and Release, is the subject of a pending appeal. This Settlement and Release does not purport to dispose of the sanctions order or the appeal from said order.

11.    <u>Representations</u>.    The Parties expressly represent that they have freely and voluntarily entered into this Release and Settlement Agreement after careful review and consultation with their respective counsel.  Except as otherwise expressly set forth herein, no representations have been made by any of the parties with respect to any of the matters addressed in this Release and Settlement Agreement or with respect to the Litigation.

12.    <u>Binding Release and Settlement</u>.  This Release and Settlement Agreement will bind and inure to the benefit of each of the undersigned Parties' respective assigns, predecessors, successors, receivers, guardians, executors, administrators, heirs, partners, directors, officers, employees, shareholders, agents, beneficiaries and assignees, whether so expressed or not.

13.    <u>Governing Law</u>.    The terms, conditions and provisions of this Release and Settlement Agreement shall be governed by, and construed in accordance with, the United States Bankruptcy Code and to the extent applicable, the internal laws of the State of Missouri, without giving consideration to any other state's conflict of law provisions.

14.    <u>Headings</u>.  The use in this Release and Settlement Agreement of headings is for the convenience of reference only.  Such headings are not and shall not be considered to be part of this Release and Settlement Agreement, nor shall such headings control the construction or interpretation of the terms and conditions hereof.

15.    <u>Jurisdiction</u>.  The Bankruptcy Court retains jurisdiction to enforce the terms and conditions of this Release and Settlement Agreement.

16.    <u>Severability</u>.  Any term or condition of this Release and Settlement Agreement found to be illegal or unenforceable shall not render this Release and Settlement Agreement void or unenforceable.  Such terms or conditions shall be replaced by a provision, which reflects the original legal, enforceable intent of the Parties.

17.     <u>Disputes and Enforcement</u>.    All disputes and judicial enforcement regarding this Release and Settlement Agreement shall be resolved by the United States Bankruptcy Court for the Eastern District of Missouri.

18.     <u>Attorneys Not Parties to this Release and Settlement Agreement</u>: Attorneys to the Parties of this Release and Settlement Agreement are not considered parties of this agreement. Any obligations of attorneys to Parties of this agreement stem from the attorney's obligations to their client under Missouri Supreme Court Rule 4 and are not independently created by this agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Release and Settlement Agreement to be signed by itself or its duly authorized agents as of the date set forth in the first paragraph of this Release and Settlement Agreement.

**Plaintiff**

Latoya Steward _____ 4-3-14

Latoya Steward _____ Date

**Defendants**

Critique Services LLC _____ Date

By _____

James Robinson _____ 4/1/14
James Robinson                    Date

Ross Briggs _____ 4-1-14
Ross Briggs                         Date

Beverly Diltz _____ 4/1/14
Beverly Diltz                      Date

Renee Mayweather _____ 4/1/14
Renee Mayweather                Date

Doreatha Conners _____ 4/1/14
Doreatha Jefferson                Date
aka Derotha Conners

1

# ATTACHMENT  F

**UNITED STATES GOVERNMENT**
**OFFICIAL MEMORANDUM**

**Bankruptcy Court**
**Eastern District of Missouri**


To:      Judge Rendlen's Chambers

Date:  July 25, 2014


Elbert Walton filed  34 cases between 2013 and 2014. The breakdown of filings is a follows:

**2013**
Chapter 7 (12 cases)
Average compensation rate was $343.75 per case or $4125.00

Chapter 13  (12 cases)
Average compensation rate was maximum allowable by the Court.  11 of the 12 cases Mr. Walton's compensation was $3000.00 per case and one case was $4000.00 or $34,000.00, if the case went to completion.


**2014**
Chapter 7  (3 cases)
Average compensation rate was $429.33 or $1288.00 total

Chapter 13  (7 cases)
Average rate of compensation was the maximum allowable by the Court, which at the time is $4000.00 or $28,000.00, if the case went to completion.

**Average compensation for 2013 and 2014.**
Chapter 7 (15 Cases) $360.86

Chapter 13 (19 Cases) $3263.15